# JULIAN E. GITTINGS

*vs.*

## THEODORE F. VON DORN ET AL.

*Action for Deceit—Requisites—Evidence.*

To sustain an action for deceit, plaintiff must show that defendant's representation was false; that its falsity was known to defendant, or that it was made with reckless indifference as to its truth; that it was made for the purpose of defrauding plaintiff; that the latter not only relied on it but had a right to rely on it in full belief in its truth; that he would not have done the thing from which the injury resulted had not such misrepresentation been made, and that he actually suffered damage from such misrepresentation.                     p. 15.

In an action to recover damages on account of representations made by defendant to plaintiff, in connection with the sale of certain lumber properties, *held* that defendant's statement as to his authority to represent the companies owning these properties were *not so inconsistent with the actual facts* as to impute to him a fraudulent purpose in making the statement.                     pp. 22–30.

Defendant's statement to plaintiff that if the latter was in position to furnish a purchaser for the properties he, plaintiff, could get contracts for his commissions, could not be construed as a representation by defendant that he himself had authority to execute such contracts.                     p. 30

*Decided February 6th, 1920.*

Appeal from the Court of Common Pleas of Baltimore City (STANTON, J.).

The cause was argued before BOYD, C. J., BURKE, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*John C. Gittings,* with whom was *Joseph Addison* on the brief, for the appellant.

*Arthur L. Jackson,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

This is an action for deceit, brought by the appellees against the appellant to recover damages said to have been sustained by them, because of certain alleged misrepresentations made to them by the appellant.

The declaration consists of four counts. In the first it is alleged, that:

"In September, 1913, the appellee, Theodore F. Von Dorn entered into a contract or an agreement with one Roscoe Crary, 'both individually and as president of the Dare Lumber Company, a body corporate, duly incorporated under the laws of the State of New York, whereby the said plaintiff agreed to seek a purchaser for the properties of the Dare Lumber Company, situated at Elizabeth City, North Carolina,' consisting of sawmills, timber, lumber, supplies, etc., 'and of the East Lake Lumber Company, a body corporate, duly incorporated under the laws of the State of New York, consisting of 180,000 acres of land, more or less, with the timber thereon, situated in Dare County, North Carolina, and for his services in finding such purchaser the said Roscoe Crary, individually and as president of the Dare Lumber Company, and as the alleged authorized agent of the East Lake Lumber Company, agreed to pay to the said Von Dorn, plaintiff, * * * a consideration, commission, or brokerage, in the event of a sale of the said property, amounting to $50,000.00. And, thereafter, to wit, in the month of October, 1914, the said Von Dorn, the plaintiff, * * * entered into negotiations with Julian E. Gittings, the defendant, * * * (appellant in this court) both individually and upon representation by him that he was the *president and a director of the East Lake Lumber Company, and a large stockholder in said company,* and

further, upon his representation that he was the *author-ized agent of the said East Lake Lumber Company,* and also of the Dare Lumber Company, whereby the said Von Dorn, plaintiff, * * * undertook to seek a pur-chaser for the properties of the said Dare Lumber Company and the East Lake Lumber Company, and such negotiations were had between the said plaintiff and the defendant, * * * as that on the 24th and 25th days of November, 1914, and at divers other times, the defendant, * * * craftily contriving and intending to deceive, defraud and cheat the plaintiff, * * * rep-resented to the plaintiff, Von Dorn, that if the said Von Dorn could furnish and procure a purchaser for the said property, he, the said *Von Dorn, could and would obtain a contract for compensation or commis-sions for such sale,* and falsely informed the said Von Dorn that he was a *large stockholder* in, and a *director* and *president* of the East Lake Lumber Company, and that by a *resolution of the stockholders or Board of Directors of said company and said Dare Lumber Com-pany,* he was *authorized to contract for the payment of a commission or brokerage or compensation to be paid* in the event of a sale of the properties of the said companies, amounting to $50,000.00, and that as soon as a sale was negotiated to any person introduced by the plaintiff, * * * the *defendant would procure and deliver to the plaintiff, Von Dorn, a formal contract for the sum of* $50,000.00, *and that he would person-ally assume or adjust the compensation* or commissions to be paid to the plaintiff, * * * in the event of a sale of the said properties, and that *the said Crary and the defendant, * * * were the only persons authorized by the above-named corporations to sell and dispose of the said properties.* That during the month of Octo-ber, 1914, the plaintiff, Von Dorn, associated himself, as party to the above-named contract, with the knowl-edge and consent of the defendant, * * * the plaintiff, Frank Weeks, as co-contractor with the plaintiff, Von Dorn. And relying upon said false and fraudulent

representations, on or about the 5th day of February, 1915, the plaintiffs, * * * believing at that time the said representations to be true, and having no knowledge nor notice of their falsity, agreed with the defendant, * * * that the compensation or commissions to be paid to the plaintiffs in the event of a sale of the said properties should be $50,000.00. And thereafter the plaintiffs, * * * relying upon the truth of the statements made by the defendant, * * * to wit, that he and the said Crary were the only persons authorized by the said companies to dispose of the said properties, and that he was a large stockholder and a director and the president of the said East Lake Lumber Company, and that by resolution of the stockholders or Board of Directors of said East Lake Lumber Company and said Dare Lumber Company, he was authorized to contract for the payment of a commission or brokerage or compensation to be paid in the event of a sale of the properties of the said companies, amounting to the sum of $50,000.00, and that as soon as a sale was negotiated to any person introduced by the plaintiff, * * * the defendant would procure and deliver to the said Von Dorn a formal written contract for the said sum of $50,000.00, and that he would personally assume or adjust the said compensation or commissions to be paid to the plaintiffs, * * * in the event of a sale of the said properties, introduced to the defendant, * * * and to the said Crary a certain George F. Montgomery, of New York City, as a prospective purchaser of the said properties, and actively aided and assisted in carrying on such negotiations with the said Montgomery as that said negotiations were finally consummated by the sale of said properties to the said Montgomery, and the purchase of the same by him for the sum of $1,000,000.00.

" 'And the plaintiffs further say that the said representations of the defendant, Gittings, * * * were in fact false and fraudulent, and known to be false and fraudulent by the said Gittings when made, in that

said Gittings was not at that time the president and director, or a stockholder, of the said companies, or either of them, and was not authorized by the said companies to make a contract with the plaintiffs, * * * or either of them, to bind the said companies, or either of them, to pay to the plaintiffs, * * * a commission or compensation for the making of said sale, but said false and fraudulent representations and statements were made by the defendant, * * * craftily contriving and intending thereby to induce the plaintiffs, * * * to secure a purchaser for the said properties, and to deceive, defraud and cheat the plaintiffs, in that in fact the said Julian E. Gittings then had a contract with the said companies, whereby he was to be paid a commission in the event of a sale of the property of the East Lake Lumber Company of 10% in case he procured a purchaser of the said companies, knowledge of which fact the said Gittings fraudulently and maliciously suppressed and kept from the plaintiffs, * * * and the plaintiffs had no knowledge nor notice of the falsity of any of the statements made by the said Gittings, as above recited, and no knowledge nor notice of the real and true agreement between him and the said East Lake Lumber Company, whereby the plaintiffs have been deceived, cheated and defrauded, in that they have not received any commission from either of the said companies, or from the defendant, or from any other person, for negotiating the sale of the properties above mentioned, although upon such sale the said Gittings has received his commission for the same.' "

In the second, third and fourth counts of the declaration, no allusion is made to the alleged contract between Von Dorn and Crary, which is mentioned in the first count of the declaration. In other respects, these counts are very similar to the first count. In the second it is alleged that the defendant represented to the plaintiff that he was the authorized agent of the two corporations and was authorized by them "to contract so as to bind them and each of them for the payment of

a commission" to the plaintiff if he furnished or procured a purchaser for said properties. While in the third count it is alleged that the defendant, in addition thereto, represented himself to be the president and a director of the East Lake Lumber Company; and in the fourth count, that he was the agent of the East Lake Lumber Company and authorized by it to make a contract binding upon said company to pay commissions for the sale of said property.

A demurrer filed to each of the counts of the declaration was overruled and the general issue plea, that the defendant did not commit the wrongs alleged, was filed. The case then proceeded to trial and resulted in a verdict for the plaintiffs for the sum of $50,000.00. A judgment was entered thereon for that sum and it is from that judgment this appeal is taken.

Eleven exceptions are found in the record to the rulings of the Court upon the admission, or rejection, of testimony and one to its rulings upon the prayers.

The defendant's first prayer asked that the jury be instructed that "there is no evidence in this case legally sufficient to entitle the plaintiffs to recover under the pleadings in the case, and their verdict must be for the defendant." This prayer was refused.

In considering this prayer we must be controlled by the well established principles of law upon which the plaintiff's right to recover in cases of this character depends. To entitle the plaintiff to recover it must be shown: (1) that the representation made is false; (2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage directly resulting

from such fraudulent misrepresentation. *McAleer* v. *Horsey,* 35 Md. 439; *Buschman* v. *Codd,* 52 Md. 202; *Robertson* v. *Parks,* 76 Md. 118; *Cahill* v. *Applegarth,* 98 Md. 493; *Boulden* v. *Stilwell,* 100 Md. 551.

"The foundation of the action is actual fraud, and nothing short of this will suffice. * * * The fraud must be material, by which is meant that without it, the transaction would not have been made. It must be a statement of an alleged existing fact, or facts, and not merely of some future or contingent events, or an expression of opinion as to the subject of the statement." *Boulden* v. *Stilwell, supra.*

As said by JUDGE MILLER, speaking for this Court in *McAleer* v. *Horsey, supra,* the leading case in this State upon the action for deceit: "No better rule can be given for deciding the question (whether the fraud is material) than this —if the fraud be such that, had it not been practised, the contract could not have been made or the transaction completed, then it is material to it, but if it be shown or made probable that the same thing would have been done in the same way if the fraud had not been practised, it cannot be deemed material."

The evidence in this case discloses that on the 7th day of October, 1912, and for years prior thereto, there existed two corporations located in the State of North Carolina, one known as the Dare Lumber Company and the other as the East Lake Lumber Company, both incorporated under the laws of the State of New York. The property of the first consisted of saw mills, machinery and equipments, boats, warehouses, etc.; while the property of the other consisted of one hundred and eighty thousand acres of timber lands situated in said State of North Carolina, upon which the Dare Lumber Company held a mortgage for the sum of one hundred and fifty thousand dollars. For several years prior to the date above mentioned the Dare Lumber Company had been cutting and sawing the timber of the East Lake Lumber Company under a contract with it, by the terms of which the

latter company was to be compensated for its timber by the payment to it of one-fourth of the profits of the Dare Lumber Company. It seems, however, that no profits were earned by that company and nothing was paid to the East Lake Lumber Company for its timber, and consequently the payments of interest on its mortgage were not met.

In this condition of affairs it was finally decided by the two companies to make a joint sale of their properties, believing that it would be to their mutual advantage that such joint sale should be made. Therefore the directors of the Dare Lumber Company held a special meeting on the said 7th day of October, 1912, and the minutes of that meeting, which were offered in evidence by the plaintiffs, show that a committee appointed at a previous meeting, "to meet with Messrs. John C. Gittings and Julian E. Gittings (the defendant) at Philadelphia, on September 9th, 1912," made its report and at such meeting a resolution, approved by John C. Gittings, president of the East Lake Lumber Company, was passed, authorizing, empowering and directing Mr. Roscoe Crary as president of the Dare Lumber Company "to act with Mr. John C. Gittings, president of the East Lake Lumber Company, each in behalf of his own company, to negotiate and sell all the property interests of both companies at such price as they may mutually agree upon," and of the net amount received therefor two-thirds were to be paid to the Dare Lumber Company, which it was understood should "include the payment and satisfaction" of the mortgage held by it against the East Lake Lumber Company, and one-third to the last named company.

On the 25th day of March, 1913, at a meeting of the directors of the East Lake Lumber Company, a resolution was passed by which John C. Gittings, the president of that company, "was appointed a committee of one to make sale of the property of the East Lake Lumber Company, jointly with Mr. Roscoe Crary as a committee appointed by the Dare Lumber Company, upon such terms and conditions as the

presidents of the two companies may agree upon, in accordance with the understanding of the two companies expressed in the resolution of the Dare Lumber Company under date of October 7th, 1912."

The plaintiff, Von Dorn, a practicing lawyer of New York City, in July or August, 1913, heard through a client that the properties of these companies were in the market. He first wrote to one, Greenleaf F. Van Gorder, a lawyer of Buffalo, who, he was told, had the properties for sale, but after an exchange of three or four letters, nothing was done and the matter was dropped. He next wrote to C. F. Hotchkiss, who, he had heard, was the president of the Dare Lumber Company. In reply thereto he received a letter from Roscoe Crary of Elizabeth City, N. C., president of the Dare Lumber Company, dated September 4th, 1913. In this letter he, Crary, states that the letter to Hotchkiss had been referred to him, and in it he asked Von Dorn to send to him a statement that Von Dorn said in his letter was given him, containing data as to the company's property, and declined to answer further until his request was complied with. On September 6th, Von Dorn replied to this letter sending to Crary the statement requested and urged upon him the necessity of immediate action so that he could at once place the property before a client with whom he seemed to think delay would be dangerous. This letter was answered by Crary on September 8th, in which he acknowledged receipt of certain correspondence between Von Dorn and others in reference to the property, but stated he was then too busy to go through it, but would do so at his earliest convenience and would forward it to the president of the East Lake Lumber Company. On September 16th Von Dorn again wrote Crary acknowledging receipt of his letter of the 8th, stating that he would leave New York for St. Louis on the 24th and would be away more than two weeks and asked, if the property was to be offered for sale, that authorization contracts be executed at an early date, as the parties interested in the property were

planning extended trips, and that he would immediately arrange for the introduction of the seller and buyer upon receiving proper authorization.

On September 18th Crary called to see Von Dorn, and after his departure, he, Von Dorn, on the same day wrote him a letter asking for further information as to the property and terms of sale. On September 20th Crary wrote stating he had talked with Mr. Gittings of the East Lake Lumber Company and they had concluded, inasmuch as he was a stranger to both of them, they would first make some inquiry as to him, and, if upon such inquiry they were satisfied with him, they were "willing to do the following":

"Providing we can trade with the people you name as your customers, we will give you a commission of $50,000. We would not care to give any more. We will not make it any specified per cent. and we will not give you any price, but we will deposit our agreement in some trust company, and you can deposit the name of your customer, and it will be distinctly understood that you will have the privilege of naming no other customer than this man first mentioned, just as I talked with you the other day.

"When you have named your man and he is on the ground, we will take it up with him and do the figuring; we being familiar with the lumber business can of course handle him very much better than you can. Will this arrangement be satisfactory to you?

"We don't want you to say to Mr. Barnes, or Mr. Van Gorder or anyone else that you are in any way figuring with us in this matter,, nor do we want your customers to talk about it. * * *

"So far as your going to St. Louis is concerned, to attend court, why that need not interfere with this. You could give us the name of your people even from there, and it can then be taken up with them."

On September the 22nd, Von Dorn wrote Crary that he had received his letter of the 20th, and had forwarded it to B. A. Howland, Boston, Mass., who he said was associated with

him in the transaction, and that Howland would communicate with Crary concerning the plan for submission of the business to interested parties. He then referred to the offer contained in Crary's letter to pay him $50,000.00 for that which was to be done by him, saying that he thought it was hardly adequate for a proposition of two millions of dollars, especially in view of the fact that he expected the brokerage to be divided into four, if not five parts, and that, in his opinion, the brokerage should not be less than $100,000.00, but "whatever arrangements you make with Mr. Howland will be satisfactory to me, and he will explain the situation in detail and give you the names of the parties to whom the business is to be offered."

Von Dorn testified that the matter was then turned over to Mr. Howland and there was no further communication between himself and Crary until Crary telephoned him in October, 1913, and two or three days afterwards he had a further conversation with him. After that conversation, there was correspondence between John W. Field and Crary, and finally a correspondence between the defendant and Field. That he first heard of the defendant in the latter part of November, 1913, when Crary mentioned him over the 'phone, and that his first communication with the defendant was by a letter received from him, dated September 22nd, 1914.

In his cross-examination, Von Dorn stated that Crary in said conversation with him over the 'phone, when he was about to leave for the State of Wyoming, told him that if he had a prospective purchaser, to take it up or communicate with Julian E. Gittings, the defendant, who had full authority to negotiate the sale of the property.

John C. Gittings, president of the East Lake Lumber Company, and brother of the defendant, when placed upon the stand by the plaintiffs, testified that the two companies agreed at the time they decided to make a joint sale of their properties "that there should be no general offer of these properties for the reason that it interfered with the operations and

cheapened them, and further, that the properties should not go on the market, and any application that came from anyone who desired to examine the property, if upon investigation it turned out they were responsible people and wanted to buy, then their proposition would be entertained." That the defendant (Julian E. Gittings) was employed "to make such preliminary investigations for the two companies," and was to be compensated therefor by the payment to him of 10% commissions on the amount of the sales of said properties. The witness testified, however, that such employment was not authorized by any formal resolution of the Board of Directors, but stated that "it was reported to all the stockholders at that time or their representatives" and "everything that was done was acquiesced in by them." He was then asked "was there any resolution of the East Lake Lumber Company passed at any time authorizing Julian E. Gittings to make a contract binding that company for commission in the event of a sale of the property? Ans: Binding that company to pay commissions? Ques.: Yes. Ans.: The company never authorized him to bind it in any way, shape or form, that is, so far as I know. "

When called to the stand on behalf of the defendant, he was asked to explain what he meant by the above answer and his reply thereto was "what I had reference to, as I understood the question to mean, whether they had passed any resolutions that I was familiar with, that gave him authority to bind the company to make any contracts in its name. I did not mean by that language to convey to anybody's mind that he had not the authority to negotiate for a purchaser up to the point of an actual sale in behalf of the East Lake Lumber Company or the Dare Lumber Company. Quite to the contrary, I tried to make plain in every way I could, that he was employed by these two companies for that very purpose. The very object of the meeting of that day in Philadelphia was to get matters in shape so that one man alone would take up the negotiations and conduct them up to the point of an

actual sale and he was the logical man in view of the situation of the companies at that time."

Julian E. Gittings testified that he was present at the meeting between the directors of the Dare Lumber Company and John C. Gittings, who was acting for the stockholders and directors of the East Lake Lumber Company, in Philadelphia, in October, 1912, and at that meeting he "made a statement to the two companies of the situation. At that time there was an agreement between Crary and John C. Gittings with the witness in reference to the conduct of the sale of the combined properties, which was not in writing. The agreement was that the witness * * * should go ahead and handle the properties and make the investigation as far as the brokers and the brokers' statements were concerned; and see whether the men they had in view were financially able to buy the property. At this time defendant had in his hands between 75 and 85% of the stock of the East Lake Lumber Company. From then down to February 13th, 1917, he continued to have control of it, of which fact the presidents of the East Lake Lumber Company and the Dare Lumber Company were advised."

In the light of this evidence as to the authority of Julian E. Gittings to participate in the sale of the above mentioned properties we will consider the representations made by him which form the basis of this action and upon which the plaintiffs predicate the alleged fraud and deceit practised by the defendant causing the injury complained of.

Julian E. Gittings first appeared in these negotiations by letter dated December 2nd, 1913, to John W. Field, an associate of Von Dorn in the sale of these properties. In that letter he states that he has his (Field's) letter to Crary of November 15th, and that Crary had gone to the coast and would not return for a month. He then called Field's attention to the lapse of time since Von Dorn's original statement that he had a client ready to take over the property; and by letter of December 5th, 1913, to Field, in reply to one from

him of the third, he tells Field "I will recommend to Mr. Crary he enter no further agreement until you have matured your plans, to at least a degree to warrant the Dare and East Lake Lumber Companies in believing there is a possible chance of making sale." This, as Von Dorn stated, was the last letter from Gittings to Field that he was aware of.

On September 22nd, 1914, Julian E. Gittings wrote Von Dorn acknowledging receipt of copies of his letters of the 28th of August and 1st of September, 1914, to Col. Johnston, a director of the East Lake Lumber Company, that had been forwarded to him by Barnes of Savannah, Georgia, also an associate of Von Dorn. In these letters from Von Dorn to Johnston the writer speaks of what he had learned of the size and quantity of timber, etc., upon the property and concluded his letter by saying—"Mr. Field emphasizes the importance of having the commission contracts settled before we open negotiations with the proposed buyers," and suggested that the company "pass resolutions authorizing the payment of the brokerage and the sale of the property." The defendant in his said letter of September 22nd, to Von Dorn, replying thereto, said: "I am authorized to make a sale of these properties and perfectly willing to cooperate with you provided you have a purchaser who is financially able to absorb them."

On October 10th Von Dorn wrote the defendant in regard to a proposal to lease the property and said that he on the preceding day talked with Crary over the phone and had said to him that he had in the last two weeks presented the "business" to two parties, but nothing had developed from it, and that he had also told him of the circumstances which brought him in touch with Col. Johnston. To this letter the defendant replied that he did not see how the proposition of a lease could be carried into effect, and further stated the trouble now is there are too many "fingers in the pie" and in his judgment there should be only one to show the best result. A lengthy correspondence followed between Von Dorn and defendant in relation to the sale or lease of the properties, but

we need only state such parts of it as reflect upon the question here to be decided.

On the 24th day of November, 1914, the defendant wrote Von Dorn the following letter:

> "Mr. Barnes writes me under date of the 23rd that a possible sale of these properties is held in abeyance account of some commission agreement with Col. Johnston.
>
> "I have replied to this letter that this need not interfere, and I would personally assume or adjust this part of this matter, and would be glad to go into details any time you have a purchaser and provide you with proper commission contract when you are in position to talk business."

On the following day, November 25th, as a further reply to the letter of Barnes, he wrote Von Dorn saying:

> "If you are in a position to furnish a purchaser for these properties, you can get necessary contract for your commissions.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> "Mr. Crary and myself are handling this matter, and no one else has any authority, and when we are satisfied the prospective purchasers are serious we are ready to do business."

On February the 1st, 1915, Von Dorn wrote the defendant. This letter was not put in evidence, it having been mislaid as stated by Von Dorn, but the reply thereto of February 5th, by defendant, is as follows:

> "I have read your letter of yesterday with interest.
>
> "You will recall or your records will show Mr. Crary's agreement with you in case of a sale was a comm. would be paid of $50,000.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> "If Mr. Brandon comes to any definite offer worthy of consideration I will confer with you.
>
> "In the meantime would suggest you disabuse your mind of any large commissions, for cannot see any

offer Mr. Brandon could make which would permit any such being paid."

In his testimony Von Dorn stated at a meeting in Mr. Gittings' office on February 11th, 1915, Mr. Brandon, Weeks and himself being present, at which the properties were generally discussed. That he at the time asked defendant "whether the stock of the East Lake Lumber Company was closely held," and defendant said: "It was, most of the stock was *held by himself and members of his family.* * * * That he was a director and large stockholder of the lumber company.".

On May 13th, 1915, the defendant wrote Von Dorn saying:

"Mr. Brandon writes under date of the 12th inst. that his plans are all changed by the war conditions, and do not care to consider further these properties."

So this ended the negotiations with Mr. Brandon as a possible purchaser.

The next letter from Von Dorn to defendant was on December 23rd, 1915. In it he tells defendant that he has met George M. Montgomery of Jacksonville, Florida, and New York City, and speaks of him as a man who had been in the lumber business for thirty years and was then endeavoring to locate a good timber and milling proposition which he could operate under a contract for a division of the property, that he was highly endorsed by reputable business men including a number of heads of financial institutions of New York, Georgia and Florida. He further stated that he was not financially able to invest any money in a lumber or timber proposition but wished to find one which the owners would turn over to him under an operation contract; that he had a market for a large quantity of lumber. In another letter, January 5th, 1916, VonDorn suggests an exchange of the lumber properties with Montgomery for an equity in apartments owned by him in New York. The defendant replied

to these letters stating that neither of these propositions could be considered.

After several letters from Von Dorn to the defendant in which the latter was asked to arrange for a meeting with Montgomery at the office of the defendant in Baltimore, the defendant wrote Von Dorn on January 17th, 1916, that he was going to Philadelphia on a day named and said he would meet Montgomery there, but it seems that Von Dorn was unable to communicate with Montgomery in time for such meeting, and the defendant returned to Baltimore without seeing him. There was no further communication between Von Dorn and the defendant until the 4th day of May, 1917, after the sale of the property. Although Von Dorn had previously testified as to what was said by the defendant to him at one of the two meetings in Baltimore, he, when again asked as to these interviews, stated that the defendant also told him at one of the said meetings that the directors of the two corporations "had passed resolutions appointing him and giving him authority to make sale" of said properties, "and to contract for the commissions." °

Von Dorn was asked upon cross-examination: "Did you mean to convey to Mr. Gittings (by the letter of December 23rd, 1915,) the idea that you were sending Mr. Montgomery to him as a proposed buyer who was able and willing to acquire these properties? A. Not at that moment. Q. You understood that you were to offer somebody, not a broker, but somebody that was able and would be satisfactory to the companies and capable of purchasing these properties, or capable of entering into a proper lease? A. That is correct. Q. Did you read Mr. Montgomery's proposition before you enclosed it to Mr. Julian E. Gittings? A. I believe I did, I am not positive. Q. Did that strike you, as an intelligent man, as a proposition that would meet with the requirement that you recognized that Mr. Crary and Mr. Gittings both had placed upon any negotiations that they would undertake? A. I did not pass judgment on that. I thought it was worthy of sub-

mission and it was up to Mr. Julian Gittings to determine whether or not he and his associates would be interested. Q. Did you consider that a proposition to buy? A. Outright? Q. Yes? A. No."

The plaintiff, Weeks, also testified as to the conversation between Von Dorn and defendant and in giving his version of it said, he stated the defendant said: "I and my immediate family control—we have a large control of the East Lake Lumber Company, and I am in a position to make a contract with you." He further stated the defendant told him that he was at the head of that company.

The defendant testified that Montgomery called to see him at the Maryland Club in Baltimore and told him that Von Dorn had said he (the defendant) had turned down his offer on the Eldorado Apartments, to which the defendant said he had, as the offer did not interest him at all.

The defendant further stated that Montgomery told him that he had "practically gone under with the Knickerbocker Trust Company and was looking for something to earn a living by." Thereafter the defendant frequently heard from Montgomery in relation to his efforts to find a purchaser for the properties. In Montgomery's letters to defendant it is clearly shown that he was not a prospective purchaser, but was endeavoring to sell to others. In one of these letters he asked defendant not to talk to a party by the name of "Byrdseye" about the proposition should he call to see him. In another he speaks of the probabilities of the International Paper Company and others buying the properties.

On February 4th, 1917, he wrote the defendant, as follows:
"I have just received a telegram from atty. of the Insurance Co., advising of arrangement of terms of payment, etc., etc., for that purpose will meet me at your club on my return from Dare County. * * * ."

The defendant was asked: "What did the insurance company, so far as you know, have to do with this last deal that he was talking about, and the people that he then had in tow

and had carried down to Elizabeth City to see the property?
A. I knew nothing at that time."

He next saw Montgomery on his return from Norfolk on
the 7th of February, the day he entered into the contract with
him for the disposition of the property. "Q. Who was with
him on that date? A. Clarence Byrdseye. Q. Who was
Clarence Byrdseye and what connection did he have with the
insurance company mentioned? A. He was a lawyer and he
represented them, so he stated at that time. I understood in
the conversation that he represented the paper companies.
Defendant then testified that after making the agreement with
Montgomery he immediately notified Crary of the Dare Lum-
ber Company, and John C. Gittings of the East Lake Lumber
Company 'what he had done and to come forward and fix
it up.' Crary had named to him the price of $666,666.00
net, free of all commissions for their property, and he had at
the time an agreement made in January, 1917, with the East
Lake Lumber Company by which that company had agreed
to take $200,000 for their property, the defendant to pay off
and satisfy certain judgments then in the hands of the sheriff
for collection amounting to about $35,000.

On February 13, 1917, the president of the East Lake
Lumber Company and the defendant met Byrdseye in his
office in New York, "at which time the letters were signed
by the two companies." On that occasion Byrdseye said he
"represented the money, which was in a trust company wait-
ing for the papers to be gotten into shape." The defendant,
who was present when the transaction was closed, stated that
Montgomery "got out of the deal" one hundred thousand dol-
lars in cash and a certain amount of the bonds and stock.
The one hundred thousand dollars was paid to him by Byrds-
eye's check. A check of $666,666 was paid to the Dare Lum-
ber Company, and a check of $200,000 to the East Lake Lum-
ber Company, and checks aggregating $133,000 to the defend-
ant. The defendant upon cross-examination, in stating what
occurred at the meeting, said that Mr. Crary, his brother,

John C. Gittings, Montgomery, Byrdseye, and himself and others, met at the Commercial Trust Company's after being told by the president of that company that he had the money on deposit with which to purchase the properties of the companies. The checks were drawn, certified to and put in front of Mr. Byrdseye. At this juncture Byrdseye and Montgomery retired to a private room. Upon his return from that room he stated to the defendant that Byrdseye "was holding him up and would not pay him what he wanted or promised to give him," and appealed to the defendant to stand by him. The defendant assured him that he would not let the deeds be passed until that was done. After further consultation, however, between Byrdseye and Montgomery, the latter told the defendant that "everything was all right." The checks were then passed and the transaction closed.

On May 4th, 1917, Von Dorn wrote the defendant saying:

"Col. Weeks has just mailed clippings from yesterday's issue of the Philadelphia *Ledger* giving quite an account of the difficulties which George Montgomery and others have gotten into over the acquisition of the property of the Pittsburg Life and Trust Company.

"The article recites Montgomery, or his associate, Byrdseye, paid $1,000,000 for your North Carolina timber property. It has been a very long time since I have heard from you in reference to this matter, but as Col. Weeks and I brought you into negotiations with Mr. Montgomery for this property, we shall of course expect you to pay the commissions as agreed, if it is true that Montgomery and his associates have made a purchase.

"I know nothing at all about the deal with Mr. Montgomery and Byrdseye made with the Pittsburg Life and Trust Company, and I presume you are not at all concerned in the matter, but I will appreciate a letter from you explaining the exact situation."

A like demand was made upon the defendant by letter of June 29th. Neither of these letters, however, were answered by him.

Later suit was instituted in the courts of New York by these plaintiffs against Roscoe Crary and Julian E. Gittings, individually, and the Dare Lumber Company and the East Lake Lumber Company, but process was not served on Gittings. This suit, so far as the record discloses, is still pending.

The alleged misrepresentations of the defendant that he was authorized to make a sale of these properties and was perfectly willing to cooperate with Von Dorn should he provide a purchaser financially able to absorb them, if inconsistent with the authority conferred upon him, was certainly not so inconsistent as to impute to him a fraudulent purpose in making such statement.

The defendant, in stating to Von Dorn that he would personally assume or adjust the apprehended difficulties with Col. Johnston over his claim to commissions, was not only assuming to do that which he was authorized to do, but what was his duty to do under his employment. Nor should his statement to Von Dorn in his letter of the following day "that if you are in a position to furnish a purchaser for these properties you can get necessary contracts for your commission" be construed to mean that he was to execute the contract or had the power to execute it. His offer or promise was to provide him with a contract, one executed by the proper parties.

The defendant's statement to Von Dorn that "you will recall or your records will show Mr. Crary's agreement with you was that a commission would be paid of $50,000" had no greater significance than to call his attention to what Crary had already promised or agreed to pay him as commission. This was said when he, Von Dorn, was asking for larger commissions.

The alleged misrepresentation of the defendant that he was a director and large stockholder of the Lumber Company made so late as February, 1915, after the plaintiffs had undertaken the negotiation and sale of the properties, could not

have influenced them in their undertaking to sell the same, but if so the fact that he was a director or large stockholder would not in itself have conferred upon him the power to make the sale, but the evidence discloses that he as a matter of fact controlled a majority of the stock of that company and was authorized to sell it.

The alleged misrepresentation of the defendant that he told Von Dorn that the directors of the two corporations "had passed resolutions appointing him and giving him authority to make the sale and to contract for commissions," if made at all, was also made in February, 1915, long after he had undertaken to find a purchaser for the property, under negotiations with Crary, and after the introduction of the defendant into the negotiations, and it cannot, we think, be said that he was induced by such alleged misrepresentation to do anything that was done by him which he would not have done had not such alleged misrepresentation been made when considered in connection with what was done and said in his negotiations with both Crary and the defendant.

But without discussing further the alleged misrepresentations of the defendant, it may be said generally that the essential requisites of an action for deceit are not found in the representations complained of by the plaintiffs and the case on the evidence offered, should not have been submitted to the jury.

The judgment will therefore be reversed.

> *Judgment reversed without new trial, with*
> *costs to the appellant.*