885 F.2d 1196
 14 Fed.R.Serv.3d 874
 WESTERN CONTRACTING CORPORATION, Plaintiff-Appellant,
v.
BECHTEL CORPORATION, now known as, a corporation; Baltimore
Gas & Electric Company, a corporation, Defendants-Appellees,
v.
L. Garland EVERIST; H. Hubert Everist, Jr.; Neil E.
Dawson, Third-Party Defendants-Appellants.
WESTERN CONTRACTING CORPORATION, Plaintiff-Appellant,
v.
BECHTEL CORPORATION, now known as, a corporation; Baltimore
Gas & Electric Company, a corporation, Defendants-Appellees,
v.
L. Garland EVERIST; H. Hubert Everist, Jr.; Neil E.
Dawson, Third Party Defendants-Appellants.
 Nos. 86-1056, 88-1139.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 6, 1989.
Decided Sept. 18, 1989.
 
 George Cochran Doub, Jr. (Benjamin R. Civiletti, Venable, Baetjer and Howard, on brief), for third-party defendants-appellants.
 Robert Morley Wright (Wilbur D. Preston, Jr., Jeffrey M. Glosser, Whiteford, Taylor & Preston, David A. Brune, Henry R. Miller, Baltimore Gas and Elec. Co., H. Roger McPike, Thelen, Marrin, Johnson & Bridges, on brief), for defendants-appellees.
 Before RUSSELL, PHILLIPS and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 In this diversity action on a contract for dredging a channel in the Chesapeake Bay, Western Contracting Corporation (hereafter Western), L. Garland Everist, Hubert Everist, Jr., and Neil E. Dawson appeal from a district court judgment in favor of Bechtel Corporation and Baltimore Gas & Electric Company (hereafter referred to as Bechtel) and from the district court's denial of their motion for a partial new trial. Western initiated this action by filing a claim against Bechtel for amounts due under the dredging contract. Twenty-one months after they filed timely answers, Bechtel obtained the district court's permission to amend their answers to allege fraud and assert counterclaims against Western, seeking rescission of the contract and damages, and join three of Western's employees as additional parties. After a bench trial, the district court held that Western had acted fraudulently in negotiating two clauses in the contract and a change order for modification of the disposal basin in which the dredged material was deposited. The court entered judgment in favor of Western on its contract claim in the amount of $149,126 and in favor of Bechtel on counterclaims for $3,095,670.48. We hold that the claim against the individual employees did not relate back to the filing of the answer under rule 15 of the Federal Rules of Civil Procedure, and remand that part of the judgment relating to those defendants to allow the district court to determine whether Maryland's three-year statute of limitations for actions alleging fraud had expired prior to the filing of the counterclaims. We also hold that insufficient evidence supported the district court's award of damages with regard to the modification of the disposal area and reverse that part of the award. We affirm the remainder of the judgment.
 
 I.
 
 2
 Beginning in 1967, Bechtel acted as Baltimore Gas & Electric Company's agent to manage the design and construction of a nuclear power plant at Calvert Cliffs, Maryland. The dredging of two channels in the Chesapeake Bay for intake and release of water to cool the plant was on the "critical path" in the construction and had to be completed before work on other parts of the plant could begin. Of the five bids submitted on July 13, 1970 to Bechtel for the dredging subcontract, Western's bid of $4,066,195 was the lowest. Due to delays in obtaining a dredging permit from the U.S. Army Corps of Engineers, however, Bechtel began the work on July 9, 1971 and completed it on schedule on June 29, 1972. Bechtel paid Western a total of $5,627,450. Prior to beginning the dredging covered by the contract, the parties agreed on changes in Western's bid package. Several of these changes are at issue in this appeal.
 
 
 3
 The district court found that the prestart standby clause[1] and the escalator clause[2] of the final contract had been obtained by fraud. These clauses were negotiated by two employees of Bechtel, John DeVaughn, subcontracts administrator at Calvert Cliffs, and Erston Magis, project buyer, and three employees of Western, L. Garland Everist, president, Hubert H. Everist, Jr., vice-president and treasurer, and Neil E. Dawson, resident project manager at Calvert Cliffs. During negotiations, DeVaughn and Magis demanded and received Western's promise to pay them two cents per cubic yard of material dredged during the entire contract and ten percent of amounts received under the prestart standby clause. According to Bechtel, as a result of this promise, Western obtained escalation and prestart clauses in the contract far more favorable than it could have bargained for absent the fraudulent payments. Western, on the other hand, while admitting it made payments to DeVaughn (allegedly in response to DeVaughn's threats to harass it using his supervisory power over subcontractors), contends that neither the payments nor the contract clauses damaged Bechtel in any way.
 
 
 4
 The district court also found that Bechtel had proven fraud with respect to Western's performance of part of the contract. The contract called for Western to dispose of the dredged material in a valley behind the power plant and to construct various dikes and weirs to allow the water to drain back into the Chesapeake Bay. Soon after it began dredging, however, Western reported to Bechtel that the original design for the disposal area was inadequate because the effluent could not be stacked at the 10:1 slope called for by the contract and had a swell factor[3] greater than had been projected. It proposed to expand the disposal area at a cost of $2,515,000, which was later reduced to $1,118,000. DeVaughn, Bechtel's subcontracts administrator, backed Western's proposal but was transferred from the Calvert Cliffs project before Bechtel acted.
 
 
 5
 After protracted negotiations, Bechtel agreed to Change Order 4, which provided for an additional payment to Western of $567,200 to make certain modifications in the disposal area. Western later paid DeVaughn a five cents per cubic yard "finders' fee" for recommending to Western a subcontractor to perform the modifications. At trial, Bechtel alleged that Western had deliberately pumped the effluent into the disposal area in a manner calculated to prevent proper drainage and, by failing to construct transverse dikes, had created the inadequacy of the disposal area in order to extract additional payments. They also alleged that DeVaughn was paid to allow Western to perform in a way which created the inadequacy. Western denies that its performance caused the inadequacy and, while conceding it made payments to DeVaughn, denies that he had anything to do with the inadequacy of the disposal area.
 
 
 6
 The district court concluded that neither the escalation clause nor the prestart standby clause would have appeared as written in the contract without Western's prior agreement to pay Magis and DeVaughn considerable sums. The court found "the funds received by Western pursuant to the escalation clause ... are windfall profits to Western resulting from fraud and are traceable directly to its secret arrangement to pay substantial sums to Magis and DeVaughn," and calculated the damages as the full amount of the payments minus certain valid increases in labor costs. Further, the district court concluded that Western's prestart costs had been no more than $13,975 and that the contract clause which had set a flat fee of $2,500 a day had "worked a fraud on Bechtel and BG & E for which they are entitled to recover back the monies they paid out in the sum of $267,500." With respect to the disposal area, the district court concluded that Bechtel would not have approved Change Order 4 if they had been aware of the true circumstances and therefore had "been damaged to the extent of monies paid on account of Change Order 4 to the extent of $567,200." Finally, the district court awarded to Bechtel as damages the amount of $96,500 that Western had paid to DeVaughn and Magis.
 
 II
 
 7
 Before proceeding to the merits, we address three important procedural issues. First, L. Garland Everist, Hubert Everist, Jr., and Neil E. Dawson, the individual counter-defendants, assert that the district court lacked personal jurisdiction over them. These nonresident counter-defendants were served with process under the Maryland long-arm statute. Md.Cts. & Jud.Proc.Code Ann. Sec. 6-103 (1984). They contend the statute is inapplicable to them because Maryland recognizes the "fiduciary shield" rule that "the acts of a corporate officer or employee taken in his corporate capacity within the jurisdiction generally do not form the predicate for jurisdiction over him in his individual capacity." Bulova Watch Co. v. K. Hattori & Co., 508 F.Supp. 1322, 1347 (E.D.N.Y.1981). The district court, however, found it had jurisdiction under two sections of Maryland's long-arm statute, Secs. 6-103(b)(1) & (b)(3), and that the fiduciary shield rule did not operate to shield actions not in the best interest of the corporation.
 
 
 8
 Although the Maryland Court of Special Appeals has applied the fiduciary shield exception in one case, Umans v. PWP Services, 50 Md.App. 414, 420, 439 A.2d 21 (1982) (contacts as corporate officer did not subject defendant to personal jurisdiction), a recent decision by the Maryland court and a decision in this court bearing on these general principles has called the decision in Umans into question.
 
 
 9
 In Columbia Briargate Co. v. First Nat'l Bank, 713 F.2d 1052, 1064 (4th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984), we stated:
 
 
 10
 [W]hen a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state in which service is made upon him without the forum under the applicable long-arm statute ..., he is properly subject to the jurisdiction of the forum court, provided the long-arm statute of the forum state is co-extensive with the full reach of due process.
 
 
 11
 As Columbia Briargate makes clear, the fiduciary shield rule is solely a matter of statutory construction under state law and is not required under the due process clause. Since that decision, the Maryland Court of Appeals has emphasized that Maryland's long-arm statute is intended "to expand the exercise of personal jurisdiction to the limits allowed by the Due Process Clause...." Camelback Ski Corp. v. Behning, 307 Md. 270, 274, 513 A.2d 874 (1986), judgment vacated and remanded on other grounds, 480 U.S. 901, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987), reaff'd, 312 Md. 330, 539 A.2d 1107 (1988), cert. denied, --- U.S. ----, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988). The district court in the present case set out numerous acts and omissions of the individual counter-defendants in Maryland sufficient to satisfy due process requirements of minimum contacts and fundamental fairness. See International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In light of Camelback and the absence of a statement by the Maryland Court of Appeals that the fiduciary shield rule limits the reach of the Maryland long-arm statute under such circumstances as are here involved, it appears that the district court properly exercised jurisdiction over the individual counter-defendants.
 
 
 12
 The second and third procedural issues advanced by Western relate to the Maryland three-year statute of limitations governing actions based on fraud. See Md.Cts. & Jud.Proc.Code Ann. Sec. 5-101 (1984)--one relates to the counterclaim against Western and the other relates to the counterclaim against the Everists and Dawson, the individual defendants. Western's complaint was filed on November 1, 1974, and Bechtel filed answers on December 16 and 17, 1974. The counterclaims were filed on September 23, 1976. The answers were filed within the three-year limitations period, but the counterclaims against both Western and the individual defendants were not filed until after the limitation period expired.[4] The district court did not permit discovery concerning the time the fraud was discovered[5] because it held that both counterclaims related back to the time of the filing. See Fed.R.Civ.P. 15(c). Relation back of the counterclaims must be determined differently for Western and the individual defendants. Western, of course, was an original party. As to counterclaims against one already a party, rule 15(c) provides:
 
 
 13
 Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.
 
 
 14
 Bechtel's answers, of course, related to the dredging contract, and their counterclaims alleging fraud "arose out of the conduct, transaction, or occurrence set forth" in the answers. The counterclaims against Western, therefore, satisfied rule 15(c)'s requirements for relation back, and the counterclaims accordingly were not barred by the statute of limitations.
 
 
 15
 The individual counter-defendants, however, were not original parties. In order to have the amendments relate back to the filing of the answers, Bechtel needed to prove notice and mistake.
 
 
 16
 For amendments adding a party, rule 15(c) provides:
 
 
 17
 Relation Back of Amendments. ... An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.
 
 
 18
 The rule requires not only notice of the institution of an action but also notice of the possibility that the putative new defendant may be a defendant in that action. See Norton v. International Harvester Co., 627 F.2d 18, 21 (7th Cir.1980). Such notice must be received within the limitations period. See Schiavone v. Fortune, 477 U.S. 21, 29, 106 S.Ct. 2379, 2384, 91 L.Ed.2d 18 (1986). Notice may be presumed when the nature of the claim is apparent in the initial pleading and the added defendant has either a sufficient identity of interest with the original defendant or received formal or informal notice of the claim. See, e.g., Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253, 1258 (11th Cir.1983). Because the fraud action was not apparent in the complaint and answers, however, the individual counter-defendants did not have notice until the filing of the counterclaim.
 
 
 19
 Even were we to agree that the individual counter-defendants had sufficient notice of their potential liability so that they were not prejudiced by the filing of the counterclaim, see rule 15(c)(1), the plaintiff would be denied the benefit of the relation back provision because of failure to satisfy the requirements of rule 15(c)(2). As the Seventh Circuit has stated:
 
 
 20
 Rule 15(c)(2) permits an amendment to relate back only where there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake, but it does not permit relation back where, as here, there is a lack of knowledge of the proper party.
 
 
 21
 Wood v. Worachek, 618 F.2d 1225, 1230 (7th Cir.1980) (citation omitted); see also Norton, 627 F.2d at 22. Nothing in Bechtel's answers suggested a claim of fraud or that the individual counter-defendants had been omitted from such a claim by mistake. Indeed, Bechtel has not alleged such a mistake. The judgment against the individual defendants is remanded to allow the district court to determine whether Bechtel discovered the fraud more than three years before the counterclaim was filed. See Md.Cts. & Jud.Proc.Code Ann. Sec. 5-203 (1984 & Supp.1988). If so, the judgment against them must be set aside.
 
 III
 
 22
 On appeal, Western attacks the evidence of damages with respect to the prestart standby clause and escalation clause and the general sufficiency of the evidence of fraud in modification of the disposal area. We hold that the district court correctly found that Bechtel had been damaged by Western's fraud relating to the two contract clauses and correctly measured the damages. We agree with Western, however, that insufficient evidence supports the district court's finding of fraud in the modification of the disposal area, and reverse the judgment on that issue.
 
 
 23
 Payments to Western under the prestart standby clause were meant to compensate it for holding a dredge plant[6] available until work on the project began. Western's bid identified the Western Scout as the dredge it would use at Calvert Cliffs, but prior to a meeting on August 25, 1970 between Bechtel and Western to review the bid, Western had already offered the Western Scout for sale. Nevertheless, Western indicated in a letter dated August 31, 1970 that it would require a postmobilization prestart standby fee of $5,640 a day. In a second letter, dated November 24, 1970, Western again indicated that it wanted a postmobilization prestart standby fee and a monthly premobilization prestart standby fee in order to commit a specific plant to the Calvert Cliffs project. Although on December 7, 1970, Magis initially rejected this suggestion, he and DeVaughn discussed with Dawson on December 15, 1970 the possibility of their receiving ten percent of any prestart standby payments. At a meeting on January 21, 1971, Garland Everist stated that Western would recognize Dawson's agreements regarding the "kick back" payments to Magis and DeVaughn, and Magis had the prestart standby clause typed into the contract.
 
 
 24
 The final form of the premobilization prestart standby clause provided for an initial payment of $125,000 on March 1, 1978, and $2,500 a day from April 19, 1971. Because the Western Scout was sold on March 8 and a second dredge plant alternately designated for the job was sold soon after, the district court concluded that Western did not commit any definite plant to the project and, based on an audit of financial records, incurred no costs for prestart standby. The court found that the inclusion of the prestart standby clause as written was directly tied to the agreement to pay Magis and DeVaughn ten percent of the payments and that Magis, in fact, made no "effort to determine Western's actual or probable pre-start standby costs." In sum, it found the "whole arrangement worked a fraud on Bechtel and BG&E for which they are entitled to recover back the monies paid out."
 
 
 25
 Similarly, the district court determined that "the [escalation] clause, as written, would not have appeared in the contract without the prior agreement to pay Magis and DeVaughn substantial sums." An escalation clause is designed to adjust a price set at an earlier date to reflect changes in costs due to delay in performance of a contract. Bechtel calculated their costs for the bids on the dredging subcontract based on a year of dredging beginning in January 1971. However, delay in obtaining a dredging permit from the Corps of Engineers delayed the start of dredging until March 1971 at the earliest. Western's labor contract was to expire on October 31, 1971.
 
 
 26
 In a letter to Magis dated November 24, 1970, Western proposed tying an escalation clause to the Engineering News Record Construction Cost Index for Baltimore, an index based on the cost in the Baltimore market of 200 hours of common labor and specified quantities of structural steel shapes, Portland cement, and lumber. Western had never used this index before to measure costs for a dredging contract and has not done so since, nor were any of its witnesses aware of the indexes being used for that purpose. Magis initially rejected Western's proposal on December 7. After this date, the district court noted that "[a]lthough the parties previously had thoroughly documented their negotiations, such documentation is conspicuous by its absence in the time period under review, and what is available appears purposely vague and guarded." Nevertheless, the evidence showed that on December 14, Western suggested that if Magis could develop "an alternate yardstick," Western would consider it.
 
 
 27
 The next day, Magis and DeVaughn first discussed under-the-table payments of $.02 per cubic yard dredged with Dawson. Western approved this arrangement soon after, and, on December 31, Dawson informed the Everists that "[Magis] is now more agreeable that we should include several of the points we have been making." In early January, Magis, DeVaughn, L. Garland Everist and Dawson had several telephone conversations regarding the pre-start standby and escalation clauses. Finally, after the January 21, 1971 meeting, Magis had the escalation clause using the Construction Cost Index typed into the contract. Based on this evidence, the court held that the payments made to Western under the clauses, except for actual increases under the union labor contract after December 31, 1971, were "windfall profits to Western resulting from fraud" and that Bechtel and BG & E were "damaged to the extent of monies paid."
 
 
 28
 On appeal, Western argues the district court improperly segregated the fraudulently induced clauses from the rest of the contract, and the award of damages failed to take into account the value of Western's performance of the dredging contract. Further, Western argues that, regardless of the fraud, the final contract would have contained clauses to compensate for increased costs and prestart standby expenses. It insists that Bechtel introduced no evidence showing the form those clauses would have taken, absent fraud, thereby precluding the district court from determining the value of the actual benefit to Bechtel. Finally, Western contends the district court's award of damages improperly focused on the costs incurred by Western rather than the benefit provided to Bechtel. Concomitantly, Western argues that insufficient evidence of Bechtel's damage sustains the district court's award. We are not persuaded by Western's argument.
 
 
 29
 There can be no question that Bechtel introduced sufficient evidence to prove fraud. See generally Gittings v. Von Dorn, 136 Md. 10, 15, 109 A. 553 (1920). The issue of evidence on appeal, however, relates to damages. Contrary to Western's argument, we are not persuaded that the district court erred in segregating the fraudulently obtained clauses from the rest of the contract in determining the damages. Bechtel received no consideration for the specific ascertainable amounts paid pursuant to these clauses. Western's performance under the contract is not relevant to the fraud issue because Western was obliged to perform as it did under the terms of the original bid. The payments under the prestart standby clause and the escalation ostensibly compensated Western for additional performance. Performance and consideration under those fraudulently obtained clauses were therefore appropriately segregated from the core of the contract for purposes of calculating damages.
 
 
 30
 The Maryland courts have made clear that two separate issues may arise under the damages element of a fraud action. The first issue concerns the actual existence of damages, i.e., the plaintiff must prove that it was directly and proximately injured as a result of the fraud. See Empire Realty Co. v. Fleisher, 269 Md. 278, 284, 305 A.2d 144 (1973); Schwartzbeck v. Loving Chevrolet, 27 Md.App. 139, 146-47, 339 A.2d 700 (1975). In the present case, there was not only evidence that Western did not incur the costs contemplated by the standby and escalation clauses but also parallel evidence that Bechtel incurred expenses solely because of the clauses obtained by the defendants' fraudulent actions.
 
 
 31
 The district court found that neither the prestart standby clause nor the escalation clause would have appeared in the final contract in their final forms without the prior agreement by Western to pay DeVaughn and Magis specific amounts. Although it is remotely possible that Western made such payments to obtain clauses which merely compensated it for its services, the district court adopted Bechtel's characterization of the payments to Western under the clauses as "windfall profits" obtained through contract clauses that were more favorable that would have been obtained absent the fraud. Given this finding, we have no doubt that Bechtel proved damages.
 
 
 32
 The second issue that arises under the damages element of a fraud action relates to the measurement of damages. See Empire Realty Co., 269 Md. at 284, 305 A.2d 144; Schwartzbeck, 27 Md.App. at 146-47, 339 A.2d 700. The Maryland courts have articulated two rules governing the measurement of damages in fraud cases. Under the out-of-pocket rule, the measure of damages "is the difference between the amount of the purchase price the buyer has paid and the actual value of the property on the date it was sold." Beardmore v. T.D. Burgess Co., 245 Md. 387, 390, 226 A.2d 329 (1967) (citations omitted). Under the "benefit-of-the-bargain" rule, on the other hand, damages are measured so as to "compensate the plaintiff as though the transaction had been carried out as represented," Hinkle v. Rockville Motor Co., 262 Md. 502, 504-05, 278 A.2d 42 (1971), i.e., the difference between the actual value of the property on the date it was sold and the value of the property as represented. Maryland also has adopted the "flexibility theory" which allows a court to choose one rule or the other depending on the circumstances of the case. See Hinkle, 262 Md. at 511, 278 A.2d 42 (1971). Western, however, contends that Bechtel and BG & E have failed to prove their damages under either rule.
 
 
 33
 Both rules require some evidence of the actual value of the services rendered or goods obtained. Western's contentions of error chiefly relate to this issue. It argues that both rules require proof of the actual value of the goods or services obtained in the fraudulent transaction and that because no evidence of the value of Western's performance under the contract as a whole or under the disputed clauses individually was offered, the district court could not have calculated damages under either rule. Bechtel, on the other hand, contends that the damages award falls squarely within the first of the flexibility rules set out in Hinkle: "If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule." Id. at 511, 278 A.2d 42 (citation omitted).
 
 
 34
 The district court noted that Bechtel conceded damages could not be recovered if either the out-of-pocket rule or the benefit-of-the-bargain rule applied. Citing Hinkle and Beardmore, however, the district court determined that
 
 
 35
 the proper rule to follow is that where a party has been induced to part with his money or his property by fraud and receives nothing as consideration, the damages cannot be less than the money or the value of the property that was parted with by reason of the fraud.
 
 
 36
 Applying this rule, the district court determined that Bechtel had received no consideration for the prestart standby clause and the escalation clause, and awarded damages in the amount of the payments made pursuant to those clauses. We are uncertain what weight the district court accorded Bechtel's concession, but, under the circumstances of this case, we are persuaded that the district court's test was the equivalent of the out-of-pocket rule because a finding of lack of consideration was equivalent to a finding that the clauses had no actual value.
 
 
 37
 The district court also found that Western received the payments under the prestart standby clause without holding any specific dredge plant available. Although Western had a rented plant available when the time for performance arrived, it was obligated to that performance under the contract. The prestart standby clause was intended to provide additional compensation for holding a specific plant available, regardless of any prestart delay. Since Western did not hold a specific plant aside, Bechtel paid for a service that was not performed. The district court's award of the full amount of the prestart standby clause payments, therefore, gave Bechtel their out-of-pocket losses.
 
 
 38
 Similarily, Bechtel derived no benefit from payments to Western under the escalation clause. An escalation clause is, of course, designed to maintain a bid's profitability from the date of the bid to the date of performance so that the bidder will still be willing to perform at the later date. Evidence produced at trial, however, showed that Western's costs did not increase beyond the bid estimates aside from increases in labor costs attributable to a renegotiated collective bargaining agreement. Accordingly, as the district court found, Bechtel was damaged to the extent of its clause minus the increased labor costs.
 
 
 39
 The last substantive issue to be considered is Western's argument concerning the award against it for fraudulently inducing Bechtel to pay additional compensation for modifications to the disposal area. We reverse that portion of the district court judgment favoring Bechtel on this issue. Our decision is not based on the issues of damages but on our conclusion that Bechtel did not sufficiently prove the modification was secured by fraud.
 
 
 40
 The original design called for Western to pump effluent dredged from the bay into the disposal area. Based on a swell factor of 1.2, the design estimated a total volume of 2,875,000 cubic yards (3,450,000 cubic yards when multiplied by the swell factor) of dredged material to be disposed of in a 3,806,000 cubic yards disposal area. Western would first pump effluent into the northern end of the area, slowly moving south so as to keep the solid and silty material away from the weir. It began pumping effluent into the northern end of the disposal area in July 1971, but within a few days it moved to the southern end, and the area filled rapidly with water, preventing the construction of dikes.
 
 
 41
 Soon after it started dredging, Western reported to Bechtel that the disposal area would be 300,000 cubic yards short of the necessary capacity and recommended modifications to the design, for which it wanted to be paid an additional $2,515,000. It also reported that the dredged material was too silty to stack at a 10:1 slope.
 
 
 42
 At a meeting between Western and Bechtel on August 31, 1970, DeVaughn recommended that Bechtel agree to the modification so that they could "get on with the work." His recommendation so angered his supervisor that he was immediately removed from his duties at Calvert Cliff and soon after resigned from employment with Bechtel. After negotiations, during which Western reported that the swell factor appeared to be between 1.3 and 1.4, Bechtel agreed to Change Order 4, which provided that Western would be paid an additional $567,200 and would make certain changes in the design of the disposal area. Meanwhile, Western paid DeVaughn who no longer worked for Bechtel a "finder's fee" of $.05 per cubic yard of dredged material for recommending a contractor to perform the modifications.
 
 
 43
 The district court gave considerable weight to evidence that Western earlier had decided to try to inflate the amount of material dredged by creating a false survey of the channel suggested by DeVaughn. This survey falsely reported the depth of the channel in order to increase the amount to be dredged by 300,000 more cubic feet. Unfortunately for Western, however, a radio station in Maryland learned of the scheme, and Western officials decided not to use the false survey.
 
 
 44
 The district court found that Western had planned to increase its billings, using the false survey and the later report that the disposal area was inadequate. The court adopted Bechtel's counsel's description of the scheme:
 
 
 45
 There is no reason to doubt that what really was going to happen was these people were going to use the phony survey for increased billings, pump that disposal area full of water, and then claim the same two and a half million dollar extra for construction of the dikes on the grounds that the survey showed that there was 300,000 yards more in the bay to be dug out than Bechtel had figured and therefore the disposal area was 300,000 yards under capacity and, therefore, they were entitled not only to the phony 300,000 yards dug but also an extra [sic] to expand the disposal area.
 
 
 46
 The only difference was that because ... the phony survey was discovered ..., they just stopped as to the [phony survey] part of the scheme and continued with the second, shifting the emphasis slightly to say that well, the swell factor is a little bit higher than we figured and that's why there's 300,000 more yards in there and why it's under capacity.
 
 
 47
 The court concluded that "if Bechtel and BG & E had been apprised of the true circumstances surrounding Western's activities in connection with the false survey and the disposal area, ... Change Order 4 would not have been executed and paid by Bechtel and BG & E."
 
 
 48
 On appeal, Western attacks the district court's decision on two grounds. First, it contends that Bechtel did not prove Western misrepresented the swell factor or its inability to stack the dredged material at the 10:1 slope specified by the original design. Second, Western argues that even if it breached its contract by causing the inadequacy of the disposal area, Bechtel cannot recover absent evidence of collusion with DeVaughn to defraud them. It contends that payments to DeVaughn occurred after he had resigned from Bechtel and no evidence indicates he allowed Western to act in a way designed to create the inadequacy while he was still supervising Western's performance at Calvert Cliffs.
 
 
 49
 We are persuaded that the evidence does not support a finding that Western misrepresented the swell factor. Western's expert reported to Bechtel in October 1971 that the swell factor was between 1.3 and 1.4. This report was examined by many of Bechtel's and BG & E's experts, and Bechtel's own soils engineer reported in November 1971 (soon after the Change Order 4 had been agreed to) that his tests showed the swell factor to be 1.2 ± 20%--a range which includes Western's estimate of 1.3-1.4.
 
 
 50
 Likewise, there was not sufficient evidence to support a finding of collusion between DeVaughn and Western, or other evidence, which might have shown that the inadequacy of the original disposal basin plan and its execution was caused by anything other than Western's negligent or incompetent performance. The evidence offered by Bechtel consisted of DeVaughn's suggestion that Western inflate the amount of material dredged, a plan which was aborted and does not necessarily relate to the disposal area; his recommendation that Bechtel approve Western's original modification plan, a plan which was not in fact adopted; his offer to write a letter for Western to Bechtel supporting their plan, a letter apparently not sent; and, his recommendation of a subcontractor to Western for which he was paid $.05 a cubic yard, an arrangement which took place after he had been transferred from Calvert Cliffs. DeVaughn, of course, was involved in the aborted false survey scheme, but the fact that Western planned fraudulent billing for cubic yards dredged does not establish any collusion with DeVaughn for modification of the disposal area. In short, none of these facts support a finding of collusion between Western and DeVaughn to misrepresent the circumstances of the problems in the disposal area or to procure the change order. After the August 31 meeting, DeVaughn was not involved with the disposal area at all; Bechtel had ample opportunity to investigate the problem and to negotiate the change order with uncorrupted personnel.
 
 
 51
 The evidence, of course, shows that the disposal area in the original plan was not sufficient to contain the effluent. The burden of proving fraud, however, was on Bechtel, and the evidence of fraud in this particular simply does not satisfy the requirements of Maryland law.
 
 
 52
 The payments made by Western to DeVaughn and Magis, as a result of its agreements concerning the escalation clause, the prestart standby clause, and the finders' fee for the disposal area modification, totaled $96,750. The district court awarded this amount to Bechtel as damages stating,
 
 
 53
 [I]t is clear that when secret bribes, commissions or kickbacks are paid by a third-party to another's employee as part of a commercial transaction, fraudulent conduct by the third party to the detriment of the employer is presumed. Recovery may be had against the employee, the party paying the secret commission, kickback or bribe and any other participant under the doctrine of civil conspiracy.
 
 
 54
 On appeal, Western argues that the common law awards the value of improper payments as damages either as an approximation of the loss caused by the improper payment or, under a constructive trust theory, as the amount that should have been paid to the employer. Thus, the district court's award of the value of the improper payments in addition to damages and the actual loss suffered by Bechtel gave Bechtel a double recovery.
 
 
 55
 Some courts have allowed the amount of a bribe to be used as a measure of injury when monetary injury cannot be proved directly or specifically, while holding that the bribe itself cannot be recovered from both the briber and the "corrupted" employee. See, e.g., Continental Management, Inc. v. United States, 527 F.2d 613, 619 (Ct.Cl.1975). Other courts have characterized the recovery of both the amount of the bribe paid to an agent and the amount of fraudulent overcharges as separate causes of action. See, e.g., Sears, Roebuck & Co. v. Metropolitan Engravers, 245 F.2d 67, 72 (9th Cir.1957). In this case, Bechtel suffered two harms as a result of the fraud: overcharges made under the escalation and prestart standby clauses, and diversion of their employees' loyalty. Accordingly, Bechtel is entitled to recover both the payments made under the contract clauses and the payments to their employees. The district court's award of the amounts paid to DeVaughn and Magis is, therefore, affirmed, with the exception of those amounts attributable to the disposal area.
 
 
 56
 Finally, Western attacks the district court's award of prejudgment interest. Although the award must be recalculated on remand, we find no error in the decision to award prejudgment interest. Under Maryland law, prejudgment interest may be awarded in tort actions when the damages are "readily ascertainable." Merrick v. Mercantile-Safe Deposit & Trust Co., 855 F.2d 1095, 1106 (4th Cir.1988) (citation omitted). The district court noted that all the damage awards were based on payments of specific amounts made on particular dates. The court's determination that the amounts were readily ascertainable was not an abuse of its discretion. See David Sloane, Inc. v. Stanley G. House & Assocs., 311 Md. 36, 53, 532 A.2d 694 (1987).
 
 
 57
 The judgment of the district court is affirmed in part, reversed in part, and remanded to the district court for further proceedings in compliance with this opinion.
 
 
 58
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 Pre-start standby clauses compensate the contractor for holding equipment ready for use, and thus foregoing other jobs, when the date on which construction will begin is uncertain. The contract in this case included both a prestart standby clause and a post-start weather standby clause, for time when weather prevented dredging
 
 
 [2]
 Escalation clauses adjust price terms in construction contracts when costs can be expected to increase during performance. In this case, the bid price was expected to include all anticipated increases in costs during the year of dredging. When performance was delayed over six months because the dredging permit had not been issued, however, Western notified Bechtel and BG & E that labor costs could be expected to increase above those anticipated in the bid package because its labor contract would expire during the period of performance
 
 
 [3]
 The amount by which the volume of the effluent would increase when removed from the floor of the Chesapeake Bay
 
 
 [4]
 The counterclaim was filed under rule 13(f) which provides:
 Omitted Counterclaim. When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment.
 
 
 [5]
 Under Maryland law, the statute of limitations governing fraud actions does not begin to run until the fraud is discovered. Md.Cts. & Jud.Proc.Code Ann. Sec. 5-203 (1984 & Supp.1987)
 
 
 [6]
 A dredge plant is the dredge and its related equipment