758 A.2d 1008

**Winifred D. SWINSON**

v.

**LORDS LANDING VILLAGE CONDOMINIUM.**

**No. 141, Sept. Term, 1999.**

Court of Appeals of Maryland.

Sept. 8, 2000.

John O. Iweanoge (Law Offices John O. Iweanoge, on brief), Washington, DC, for petitioner.

James R. Schraf (Victor I. Weiner of Lipschultz and Hone Chartered, on brief), Silver Spring, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

In August, 1994, petitioner, Winifred Swinson, purchased a condominium unit in the Lords Landing Village Condominium (LLVC). Subsequent to her purchase of the unit, LLVC[1] made a special assessment on the unit owners to defray the cost of repairing or replacing rotted or exposed wood and flaking paint on the exterior of the condominium buildings, in conformance with a housing code Violation Notice issued by

---

1. The assessment was made by the Board of Directors of the Council of Unit Owners. For the sake of convenience, we shall use the acronym LLVC to refer to the condominium and all of its governing units.

the Prince George's County Department of Environmental Resources. Petitioner refused to pay the assessment, claiming (1) that LLVC gave false and misleading information in a Certificate of Resale that was supplied to her in connection with her purchase of the unit, and (2) that, in any event, by virtue of § 13–103 of the Prince George's County Code, either LLVC or the person from whom she purchased the unit was liable for the assessment.

The District Court of Maryland and, on appeal, the Circuit Court for Prince George's County, held that petitioner was liable for the assessment and that LLVC was not liable to her by reason of the information it supplied in the Certificate of Resale. Although we do not agree with all of the reasons given by the two lower courts for their respective decisions, we agree that their judgments were correct. We therefore shall affirm the judgment of the Circuit Court which, in turn, affirmed the judgment of the District Court.

## BACKGROUND

Maryland Code, § 11–135(a) of the Real Property Article, which is part of the Maryland Condominium Act, provides that a contract for the resale of a condominium unit by a unit owner other than the developer is not enforceable unless the unit owner furnishes certain documents to the purchaser. One of the documents required to be provided is a certificate disclosing, among other things, "the existence of any pending suits to which the council of unit owners is a party" and whether the Council of Unit Owners "has knowledge of any violation of the *health or building* codes with respect to the unit, the limited common elements assigned to the unit, or any other portion of the condominium." (Emphasis added). Some of that information may not be known to the unit owner. Accordingly, § 11–135(c) requires the Council of Unit Owners to "furnish a certificate containing the information necessary to enable the unit owner to comply with subsection (a) of this section."

In 1992, LLVC, aware of chipping paint and deteriorating wood on the outside surfaces of the condominium buildings,

came to the conclusion that the developer of the condominium had used defective wood products on the exterior of the buildings and, accordingly, sued the developer for damages. On March 30, 1994, while that suit was pending in the Circuit Court for Prince George's County, the Prince George's County Department of Environmental Resources issued a Violation Notice to LLVC, care of Linda Wells, Property Manager. The Violation Notice informed LLVC that an inspection the day before revealed that several buildings throughout the project had exposed wood, rotting boards, and flaking, peeling paint and directed LLVC to repair or replace the rotted wood to a sound condition and apply a weather resistant protective coating to all exposed wooden surfaces by April 30, 1994. The Notice cited, as the ordinance violated by the conditions noted, Prince George's County Housing Code, § H–321.2. According to Ms. Wells, the county agreed to defer any enforcement action while the suit against the developer proceeded.

The lawsuit was tried in May, 1994, and, on May 26, 1994, produced a verdict for $1,100,000 in favor of LLVC. What happened with the litigation thereafter is unclear. Ms. Wells stated that "certain areas of the litigation" were "being appealed." The President of the Council of Unit Owners, Ms. Barbara Griffith, testified that the developer had appealed and that, as of the date of her testimony in April 1998, the appeal was still pending. The actual record of the case, which was never placed into evidence but of which we may take judicial notice, shows that judgment was entered on the docket on June 21, 1994, that no appeal was ever taken, and that no formal effort was ever made by LLVC to enforce the judgment. The only significant post-judgment action reflected on the docket was the entry of an additional judgment, on September 19, 1994, for $144,511 in attorneys' fees. It is undisputed that LLVC never collected any money from the developer.[2]

---

**2.** At oral argument, it was suggested that the developer went into bankruptcy. Although that may be so, there is no evidence of it in this record or in the record of the lawsuit against the developer.

In July, 1994, petitioner became interested in a unit in LLVC then owned by Margaret Dickison. She inspected the unit and noticed flaking paint, particularly on the balcony. Ms. Dickison informed petitioner that there was a problem with the wood, that LLVC had sued the builder and obtained a judgment, and that the problem would be fixed. With that assurance, petitioner agreed to purchase the unit. Upon the signing of the contract, Ms. Wells, on behalf of LLVC, prepared a Certificate of Resale for Ms. Dickison, which was, in turn, delivered to petitioner. The Certificate itself is undated, but information supplied in it suggests that it was prepared on or after July 15, 1994. This litigation arises mostly out of the information supplied in Items 5 and 8.

Three pieces of information were supplied in Item 5, two of which are relevant. First, in compliance with § 11–135(a)(4)(vi), there was attached to the Certificate the most recent operating budget of LLVC, "including details concerning the reserve fund repair and replacement and its intended use of a statement that there is no reserve fund." The budget showed a number of appropriations for specific categories of repair and maintenance but, except for a $4,000 item for general repair and maintenance, there was no appropriation for the repair or replacement of the rotted or exposed wood. The only mention of painting was a small item for touch-up stripe-painting of parking lots. The budget indicated that the unit owner's assessment fee would increase from $87 to $95.70/month.

The second relevant piece of information included in Item 5 concerned litigation. In response to the statement "[t]he Council of Unit Owners is a party to the following pending lawsuits," the Certificate stated "See letter in resale package." Two letters, both from LLVC's attorney in the lawsuit against the developer, were attached. The first, dated February 5, 1993 and addressed to Ms. Wells, informed her that LLVC is "currently suing" the developer and gave the name and number of the case. Counsel stated that the case involves "alleged construction defects and alleged violations of the Prince George's County Building Code," that the complaint was a

matter of public record, and that she was invited to examine the complaint at the courthouse. The second letter, dated June 14, 1993 and addressed to the LLVC unit owners, stated that the firm represented the Council of Unit Owners and that it had filed a suit against the developer in which damages were being sought "for defects to the common areas of the Condominium, including deteriorating wood and water penetration problems." That letter also identified the case number and invited the unit owners to review the court file. No information was supplied in the Certificate as to the then-current status of the litigation.

Item 8 consisted of the statement that the Council of Unit Owners "has no knowledge of any violation of the *health or building* codes with respect to the above-described unit, the limited common elements assigned to the unit, or any other portion of the condominium" unit. That statement was in response to § 11–135(a)(4)(x), which requires the disclosure of any such violations.

Petitioner took title to the unit in August, 1994. Fourteen months later, at her first meeting of the LLVC Council of Unit Owners, she learned that an assessment was to be made on each unit in order to raise funds to comply with certain *housing* code violations identified by Prince George's County. Precisely what she learned at that time is unclear. The actual assessment made against the unit owners arose from discussions with the county Department of Environmental Resources in September, 1995. By then, the March, 1994 Notice of Violation, premised, as noted, on § H–321.2 of the county *housing* code, had been outstanding for 18 months, and the county was preparing to go to court to enforce compliance. After meeting with LLVC counsel, however, it agreed to a proposal offered by LLVC calling for a significant increase in the assessment for 1996 and 1997, payable monthly, to fund the completion of repairs by December, 1997. That agreement was confirmed in a letter from the county dated September 14, 1995. The assessment complained of by petitioner proceeded from and implemented that agreement. According to the testimony of Ms. Griffith, the president of the Council,

the total assessment was to be $4,580, payable over a three-year period—$500 in 1994, $2,040 in 1995 (or 1996), and $2,040 in 1996 (or 1997)—the latter amounts to be paid at the rate of $170/month.[3]

It is not clear whether petitioner ever paid, or was asked to pay, the $500 assessed for 1994. She clearly refused to pay any part of the $2,040 for 1996, and, in November, 1996, LLVC sued her in the District Court for $2,727, representing the unpaid assessment for one year and late charges applicable to that assessment, plus interest and attorneys' fees. Petitioner did not contest the accuracy of the amount claimed but asserted, in a counterclaim, that (1) in violation of the disclosure requirements of § 11–135(c), LLVC failed to disclose certain information and made certain misrepresentations regarding the housing code violations, and (2) by virtue of § 13–103 of the Prince George's County Code, Ms. Dickison, not she, was liable for the assessment. The principal focus of the counterclaim was on the responses in Items 5 and 8. Her claim with respect to the violations of § 11–135(c) was in the nature of a tort action for fraud or negligent misrepresentation.

As there was no dispute with respect to the amount claimed by LLVC,[4] or, indeed, with the asserted obligation of unit owners to pay assessments lawfully imposed by the Council of Unit Owners, the parties agreed that the case hinged on petitioner's counterclaim. If petitioner prevailed on her claim under § 13–103 of the County Code, she would have no liability for the assessment. Barring that, if she prevailed on her fraud or negligent misrepresentation claim, any damages

---

3. There is some discrepancy whether the monthly assessments were to be for 1995 and 1996 or 1996 and 1997. The documentary evidence, in the form of the letter from the county and the allegations in the ultimate District Court complaint suggest that it is the latter and that Ms. Griffith was mistaken in stating that the assessments were for 1995 and 1996.

4. Petitioner stipulated that the amounts claimed in LLVC's Statement of Claim represented the sums owed for assessments, late charges, interest, and attorneys' fees.

awarded would be set off against the amount of the assessment. The only matter tried, therefore, was the counterclaim.

Petitioner testified that she read and relied upon the information supplied in the Certificate of Resale and claimed that it reinforced Ms. Dickison's statement that the necessary repairs to the wood and paint would be taken care of by the developer. She viewed the absence of any appropriation or assessment in the budget for repairing the wood and flaking paint, coupled with the two letters from the lawyer regarding the lawsuit, as confirmation that those repairs would be made by the developer as the result of the successful lawsuit. She stated, "[i]t just confirmed everything else that I saw, that there was some litigation, in 1993 and had been satisfied by the time I bought it in 1994." She did not learn of the Violation Notice until, 14 months later, she attended her first Council meeting, when it was mentioned in connection with the proposed assessment. She then called the County and received a copy of the Notice.

Petitioner acknowledged that she never went to the courthouse to check the litigation file and never called the clerk's office to determine the status of the case. She asserted that she did not believe that a trip to the courthouse was necessary, and that "if I thought I had to, I would never had [sic] bought the property, I would have just taken my offer back." When questioned about the reference in counsel's February, 1993 letter to violations of the Prince George's County Building Code—the suggestion being that she was thus put on notice of a possible Code violation—she responded that the Certificate told her that, if there had been any violations, they had been satisfied, as the Certificate, being the later document, asserted that there were *no* violations. Ms. Wells stated that she included the two letters from counsel as her response to Item 5 upon the advice of counsel. She justified her response to Item 8 on the basis that, because the County had agreed not to enforce the Violation Notice pending the litigation, she did not treat the Notice as being in effect. There was, in her opinion, no Violation Notice pending.

The District Court rejected petitioner's claim founded on § 11–135 on two bases. First, it found that the Resale Certificate included, in answer to Item 5, "information concerning the pending law suit against the builder for construction defects resulting in building code violations," and invited inspection of the court file. The court concluded from this that "even a casual reading or inspection of the resale package should have alerted [petitioner] to the problems she now indicates were unknown to her." Apart from that, the court also construed § 11–135 as conferring no liability on LLVC "for providing erroneous or incomplete information." The court determined that § 13–103 of the County Code, which makes "the seller" of a dwelling responsible for complying with all issued Violation Notices affecting the property that are outstanding on the date that a contract of sale is executed, was inapplicable, as LLVC was not the seller of the unit. Upon rejecting the counterclaim, the court entered judgment for LLVC in the amount of $3,400, representing the $2,727 assessment and late fees, $230 in interest, and $443 in attorneys' fees.

On appeal, the Circuit Court agreed with the District Court that (1) although the information supplied by the Council of Unit Owners may not be "a model of clarity," it "was adequate to place [petitioner] on notice of the potential defects," and (2) § 13–103 places obligations only on "the seller" of the unit. The District Court judgment was therefore affirmed. We granted *certiorari* to review petitioner's complaint under both § 11–135 of the Real Property Article and § 13–103 of the Prince George's County Code.

## DISCUSSION

### Section 13–103

We shall deal first with petitioner's invocation of § 13–103, which is part of the County housing code and provides as follows:

"The seller of a dwelling structure and premises shall be responsible for compliance with all issued notices of viola-

tions of this Subtitle or other laws of the County, or actions in any court on account of such violations, against or affecting the property at the date of execution of any agreement of sale or transfer of ownership of such dwelling structure and premises. Nothing contained in his Subtitle shall affect the validity of any sale, transfer or disposition of any interest in real estate."

Petitioner's argument is based, ultimately, on the premise that the assessment was made in order to comply with the Violation Notice, that the Notice was issued in March, 1994, and was thus in existence when she signed the contract to purchase the unit, and that liability for compliance with the Notice therefore rests with Ms. Dickison, not her. The fact that the county may have agreed to defer enforcement of the Notice, she avers, does not alter the statutory allocation of liability. On that basis alone, she claims that she should not have been assessed. Additionally, she points out that, in preparing the Resale Certificate, LLVC knew of the outstanding Violation Notice but nonetheless failed to disclose it, stating instead that it had no knowledge of such violations. That, she contends, constitutes "constructive fraud and material misrepresentation."

LLVC responds that the obligation imposed by § 13–103 is on the "seller," and that LLVC was not the seller of the unit. It points out, moreover, that even the seller, Ms. Dickison, would have been unable to comply with the Violation Notice, which involved the common elements and not her unit. Finally, it claims that, even if the court were to treat the March, 1994 Notice as being in the nature of an unpaid assessment, § 11–110(b) of the Real Property Article makes the grantor and grantee jointly and severally liable "for all unpaid assessments against the grantor for his share of the common expenses up to the time of the voluntary grant for which a statement of lien is recorded, without prejudice to the rights of the grantee to recover from the grantor the amounts paid by the grantee for such assessments." As between LLVC and petitioner, therefore, petitioner is liable for the assessment.

Cutting through the various allegations and theories, several things become clear. First, it is evident that the assessments ultimately made were for the purpose of complying with the Violation Notice. Both Ms. Griffith's testimony and the September, 1995 letter from the county establish that much. It may be that an assessment to repair the problem would have been inevitable at some point in any event, but it is clear that the assessments actually made were in direct response to the county's decision to proceed with an enforcement action if LLVC did not resolve the deficiencies voluntarily, and, indeed, the bi-annual, monthly-paid assessment imposed by LLVC was offered by it to the county as a way of complying with the Violation Notice. Second, the Violation Notice issued in March, 1994 cannot be regarded as an "unpaid assessment" in effect prior to petitioner's purchase of the unit. Section 11–110(b) of the Real Property Article therefore has no application here.

■ Third, and determinative of the issue, the Violation Notice obviously concerned defects in the common elements, rather than Ms. Dickison's individual unit. The Notice was sent to the Council of Unit Owners, care of Ms. Wells, the property manager, not to Ms. Dickison. There is no indication that the county expected Ms. Dickison, or any other unit owner, to repair the noted deficiencies, and there is no indication that Ms. Dickison, or any other unit owner, could have done anything directly to comply with the Notice. Section 11–108.1 of the Real Property Article provides that, except as may otherwise be provided by the condominium declaration or by-laws, the Council of Unit Owners is responsible for the maintenance, repair, and replacement of the common elements, and, although the LLVC condominium declaration is not in evidence, Article III of the LLVC Council of Unit Owners by-laws charges the Board of Directors of the council with the responsibility for making repairs, additions, replacements, and improvements to the common elements. In such a situation, § 13–103 can have no application. It allocates responsibility between a seller and a buyer when the Violation Notice concerns the property being sold, and thus necessarily

assumes that the seller is legally, even if not financially, able to correct the deficiencies. Here, Ms. Dickison, not LLVC, was the seller, but the Violation Notice did not concern her unit, and she had no legal ability to comply with it. The two lower courts were correct in finding no liability on the part of LLVC under § 13–103.

### *Fraudulent or Negligent Misrepresentation— Section 11–135*

As we indicated, the District Court found no liability on the part of LLVC for fraud or negligent misrepresentation on two grounds—that (1) as a matter of statutory construction, a Council of Unit Owners is not liable under § 11–135 for concealing information or misrepresenting facts on the Certificate it is required to provide to the seller of a unit, and (2) in any event, the information supplied by LLVC in this case was sufficient to alert petitioner to the problems and was not, therefore, misleading. The Circuit Court did not address the statutory construction question, but affirmed on the alternative ground that the information supplied was adequate to place petitioner on notice "of the potential defects."

Section 11–135 itself addresses the issue only by implication. As we indicated, § 11–135(a) makes a contract for the resale of a condominium unit unenforceable unless the seller provides certain information, including the existence of health or building code violations known to LLVC and pending litigation, to the buyer. Section 11–135(c)(1) requires the Council of Unit Owners to "furnish a certificate containing the information necessary to enable the unit owner to comply with subsection (a) of this section" and states that "[a] unit owner providing a certificate under subsection (a) of this section is not liable to the purchaser for any erroneous information provided by the council of unit owners and included in the certificate." Section 11–135(c)(2) provides, however, with certain enumerated exceptions, that, with respect to the remaining information that a unit owner is required to disclose under § 11–135(a), the unit owner *is* liable to the purchaser for damages proximately caused by "an untrue statement about a material fact" or "an

omission of a material fact that is necessary to make the statements made not misleading, in light of the circumstances under which the statements were made."

As the District Court pointed out, the statute addresses specifically the liability of the seller, but is silent as to the liability of the Council of Unit Owners with respect to information supplied by it. We are aware of no cases construing either the Maryland provision or similar provisions in other States in this context. This appears to be a case of first impression.[5]

Petitioner's action, however, is not one of statutory liability. It is for fraud or negligent misrepresentation. Section 11–135 is relevant only to the extent that it provides a duty of care to a prospective purchaser such as petitioner and does not limit or abrogate any tort liability arising from the violation of such a duty.

■ To recover in a tort action for fraudulent misrepresentation, a plaintiff must prove that a false representation was made, that its falsity was either known to the maker or that the representation was made with such reckless indifference to the truth as to be equivalent to actual knowledge of falsity, that the representation was made for the purpose of defrauding the plaintiff, that the plaintiff not only relied on the representation but had a right to rely on it and would not have done the thing from which the injury arose had the misrepresentation not been made, and that the plaintiff actually suffered damage directly resulting from the misrepresentation. *See Gittings v. Von Dorn*, 136 Md. 10, 15–16, 109 A. 553, 553–54 (1920); *Martens Chevrolet v. Seney*, 292 Md. 328, 333, 439 A.2d 534, 537 (1982).

---

**5.** In *Audino v. Governor's Ridge Association, Inc.*, 20 Conn. L. Rptr. 71, 1999 WL 1241940 (1999), a somewhat similar complaint was made—that a condominium association failed to disclose in a resale certificate certain structural defects in the condominium—but the only issue before the court was whether limitations had run on the buyer's claim. The court did not discuss the substantive issue of liability.

■ To prevail in an action for negligent misrepresentation, the plaintiff must show that (1) the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement; (2) the defendant intended that the statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, took action in reliance on the statement, and (5) the plaintiff suffered damage proximately caused by the defendant's negligence. *See Martens Chevrolet v. Seney, supra,* 292 Md. at 337, 439 A.2d at 537; *Gross v. Sussex,* 332 Md. 247, 259, 630 A.2d 1156, 1162 (1993); *Sheets v. Brethren Mutual,* 342 Md. 634, 657, 679 A.2d 540, 551 (1996).

■ The courts below did not address whether LLVC owed any duty to petitioner with respect to the information it supplied to Ms. Dickison, but there can be no doubt that such a duty was owed. As a general rule, when the failure to exercise due care creates a risk of economic loss only, and not the risk of personal injury, we have required an "intimate nexus" between the parties as a condition to the imposition of tort liability. *Jacques v. First Nat'l Bank,* 307 Md. 527, 534–35, 515 A.2d 756, 759–60 (1986); *Village of Cross Keys v. U.S. Gypsum,* 315 Md. 741, 753, 556 A.2d 1126, 1134 (1989). That "intimate nexus" may be satisfied by contractual privity, which did not exist between LLVC and petitioner, "or its equivalent." *Id.* One "equivalent" is stated in § 552 of the RESTATEMENT (SECOND) OF TORTS (1965), which, in relevant part, provides that (1) a person who, in the course of its business, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on that information, if the person fails to exercise reasonable care or competence in obtaining or communicating the information, and (2) the liability of a person who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them. Those principles have been adopted by this Court and are a part of

the Maryland law. *See Village of Cross Keys v. U.S. Gypsum, supra,* 315 Md. 741, 556 A.2d 1126; *Gross v. Sussex, supra,* 332 Md. 247, 630 A.2d 1156.

■ LLVC supplied the information concerning code violations and pending litigation for the guidance of others in their business transactions. Indeed, it was under a public duty, imposed by statute, to provide that information to a unit owner for the express purpose of allowing that unit owner to transmit the information to a prospective buyer. As a prospective buyer, petitioner was clearly within the class of persons for whose benefit the duty was created. The duty to provide accurate and non-misleading information extended to petitioner.

■ The principal problem for petitioner, at least with respect to the Violation Notice, arises from a circumstance that neither the parties nor the lower courts appear to have recognized. As we indicated, Item 8 of the Certificate of Resale declared that LLVC had no knowledge of any violation of the *health or building codes.* That statement, as we further indicated, implemented §§ 11–135(a)(4)(x) and 11–135(c), which mandate the disclosure of known violations of the *"health or building codes."* (Emphasis added). The only violation apparently known to LLVC, however, did not concern the health or building codes, but was of the county *housing* code. Unless § 11–135(a)(4)(x) can reasonably be read as including a housing code, notwithstanding that the statute refers only to health or building codes, the statement made by LLVC in Item 8 was neither false nor misleading.

■ In construing statutes, we obviously begin with the language of the statute. If that language, both on its face and in context, is clear and unambiguous, we need go no further. We give the language its plain meaning. We do not add or delete words in order to reflect an intent not evidenced by what the Legislature actually said and we do not construe statutes with " 'forced or subtle interpretations' that limit or extend its application." *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 758 (1993), quoting in part *Tucker v. Fireman's*

*Fund Ins. Co.*, 308 Md. 69, 73, 517 A.2d 730, 732 (1986). See also *C & P Telephone Co. v. Director of Finance*, 343 Md. 567, 578–79, 683 A.2d 512, 517 (1996).

The requirements now embodied in § 11–135(a)(4)(x) and (c) first came into the Maryland law in 1981 with the enactment of the initial condominium law by 1981 Md. Laws, ch. 246. The requirement and the language used to express it apparently were taken from §§ 4–107(a)(11) and 4–107(b) of the Uniform Condominium Act proposed by the National Conference of Commissioners on Uniform State Laws in 1977. *See* HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE ANNUAL CONFERENCE MEETING IN ITS EIGHTY-SIXTH YEAR at 314–15 (1977). Those sub-sections of the proposed Uniform Act contained language almost identical to that placed in §§ 11–135(a)(4)(x) and 11–135(c) of the Maryland Condominium Act. Like the Maryland Condominium Act, they required the disclosure of known violations of *"the health or building codes."*

When the Maryland Condominium Act was first enacted in 1981 and when it was rewritten in 1982 and 1986, most, if not all, of the counties in Maryland had building codes patterned principally on a national model building code that, since 1950, has been promulgated and updated by the Building Officials and Code Administrators International, Inc. (BOCA). That remains the case today. In accordance with empowering provisions in the Maryland Code (1957, 1998 Repl.Vol.), art. 25A, § 5(J) and art. 25B, § 13, most, if not all, of the home rule or charter counties have adopted health-related ordinances of one kind or another, although not all have adopted separate health codes.

In enacting their local building codes, the counties ordinarily adopted the BOCA building code by reference, subject to such particular modifications that the county government desired, and added, from time to time, other provisions. In addition to the model building code, BOCA developed and published in 1964 a separate model housing code which, from and after its 1975 revision by BOCA, has been titled by BOCA as the Basic Property Maintenance Code. There is no BOCA

model health code. Unlike the situation with respect to building and housing laws, most of the health laws in Maryland are State laws, enacted by the General Assembly or by regulation of the Secretary of Health and Mental Hygiene. The local health codes, to the extent they exist in Maryland, tend to vary from county to county. They usually supplement State laws and regulations and may cover such things as local hospitals, food service facilities, pest and animal control, refuse disposal, reporting communicable diseases, swimming pools, and air pollution.

Although there may be some overlap among some of their provisions, the health, building, and housing codes generally deal with different matters and are found in separate parts of the county codes. The BOCA building code specifies substantive and procedural construction requirements for all types of structures, including standards and requirements relating to building heights, setbacks and lot lines, provisions for light and ventilation, structural loads and stresses, construction materials, mechanical systems, building floor area, egress facilities, landings, railings, slope of ramps and stairways, wall thicknesses, and fireproofing. Local building codes may add requirements relating to grading, drainage, and plumbing and electrical work and materials. The local housing codes, on the other hand, principally concern the maintenance and habitability of residential structures. They may include provisions dealing with landlord-tenant regulations, trash and litter, pest control, yard maintenance, minimum standards for light, ventilation, and heating, exterior walls, and unsafe conditions. Some of the Maryland subdivisions—including Baltimore City and Anne Arundel, Montgomery, and Prince Georges Counties—had adopted a separate housing code by 1981; others had not. In those counties that had a housing code, the housing code provisions were usually self-contained in a title, subtitle, or chapter separate from the building code. To the extent that the subdivisions had enacted health codes, they, too, were separate from the building codes.

It seems clear, therefore, that, when the General Assembly chose to specify the disclosure of health and building code

violations, it was presumably aware that there were separate housing codes in existence, both nationally and in some of the major Maryland subdivisions, and yet it omitted to require disclosure of known violations of housing codes. Whether that omission was deliberate or merely an oversight is not for us to determine; the important fact is that housing code violations are not currently required to be disclosed and LLVC did not purport to disclose any such violation.[6] The answer given in Item 8, therefore, was not false or misleading and in no way concerned the housing code violation referenced in the County's Violation Notice.

■ We turn, then, to the response in Item 5 concerning litigation. All that the law requires in that regard is a statement "of any judgments against the condominium and the existence of any pending suits to which the council of unit owners is a party." § 11–135(a)(4)(vii). The letters attached to the Resale Certificate revealed the existence of the only lawsuit to which LLVC was then a party. It is true that the answer, which comprised only those letters, revealed nothing about the current status of the litigation, but the law does not require information about current status—only the existence of the litigation. Accordingly, that answer too was in conformance with the statute and was neither false nor misleading. Because the information supplied by LLVC was not false or misleading, petitioner failed to establish an action of either fraud or negligent misrepresentation. Whether she reasonably relied upon the information given is therefore irrelevant.

JUDGMENT AFFIRMED, WITH COSTS.

---

**6.** Not all States adopted a requirement that health, building, or other code violations be disclosed. The District of Columbia law has no such requirement. Pennsylvania and Arizona once required the disclosure of health and building code violations. Pennsylvania apparently found the language too limiting and, in 1992, expanded it to require the disclosure of "any violations of applicable governmental requirements or knowledge of the existence of any hazardous conditions." See 68 Pa.C.S.A. § 3407(a)(11) (1994). Arizona, on the other hand, repealed that disclosure requirement altogether in 1996. See Ariz.Rev.Stat. Ann. § 33–1260 (West 2000).