*Herman M. Braude v. John Robb*, No. 675, September Term, 2021. Opinion by Reed, J.

**AGENCY > FIDUCIARY**

"Agency is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act." *Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 3773 (2001).

**AGENCY > FIDUCIARY**

An agent has "a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." RESTATEMENT (SECOND) OF AGENCY § 387 (1958). We have recognized the "universal principle in the law of agency, that the powers of the agent are to be exercised for the benefit of the principal *only, and not of the agent or of third parties.*" *Green v. H & R Block, Inc.*, 355 Md. 488 (1999).

**CONTRACT LAW > CONSIDERATION – DETRIMENTAL RELIANCE**

Formal consideration is not necessary to make a binding oral contract where one party detrimentally relies on the actions of another. Holding that the trial court erred when it failed to consider whether the parties had entered into an enforceable oral contract that lacked formal consideration where one of the party's, if their testimony was believed, had detrimentally relied on the other party's oral agreement to purchase a horse at an upcoming "claiming race."

**CONTRACT LAW > FIDUCIARY DUTY - AGENCY**

Holding that while an agent may serve multiple principals for the purchase of horses, that agent breaches his fiduciary duty where he purports to act as a purchasing agent for two principals concerning the same horse.

**FRAUD**

"To recover in a tort action for fraudulent misrepresentation, a plaintiff must prove that a false representation was made, that its falsity was either known to the maker or that the representation was made with such reckless indifference to the truth as to be equivalent to actual knowledge of falsity, that the representation was made for the purpose of defrauding the plaintiff, that the plaintiff not only relied on the representation but had a right to rely on it and would not have done the thing from which the injury arose had the misrepresentation not been made, and that the plaintiff actually suffered damage directly resulting from the misrepresentation." *Swinson v. Lords Landing Vill. Condo.*, 360 Md. 462, 476 (2000).

Circuit Court for Montgomery County
Case No. 483475V

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 675

September Term, 2021

_____

HERMAN M. BRAUDE

v.

JOHN JERRY ROBB

_____

Reed,
Zic,
Meredith, Timothy E.
      (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Reed, J.

_____

Filed:  July 29, 2022

*Kehoe, Christopher, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.
**Albright, Ann, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On September 15, 2020, Herman Braude ("Appellant") filed a complaint in the Circuit Court for Montgomery County against his former horse trainer, John Robb ("Appellee") alleging, among other things, breach of contract, breach of fiduciary duty, and fraud. After a bench trial, the circuit court denied Appellant's complaint for breach of contract and breach of fiduciary duty but did not address Appellant's fraud count. Appellant raises the following questions on appeal, which we have slightly rephrased for clarity:

I.      Did the trial court err in finding that there was no enforceable contract because there was insufficient consideration?

II.     Did the trial court err in finding that Mr. Robb did not breach his fiduciary duty to Mr. Braude because he was not Mr. Braude's exclusive agent for the purpose of claiming the horse named Hydra?

III.    Did the trial court err in failing to address Mr. Braude's fraud count?

For the reasons that follow, we shall reverse and remand for a new trial.

## FACTS

Each of the parties have been involved in the horse racing business for over 50 years: Mr. Robb as a horse trainer, who owns his own stable, and Mr. Braude, as a horse racing enthusiast. Additionally, Mr. Robb had been Mr. Braude's horse trainer for over 30 years. The main dispute in this case centers on whether there was an enforceable oral agreement between Mr. Braude and Mr. Robb – that Mr. Robb would claim for Mr. Braude a horse named Hydra during a race on January 4, 2020 at the Laurel Park Racetrack. According to Mr. Braude, Mr. Robb assured him several times that he would do so, but in fact did not. According to Mr. Robb, he had advised Mr. Braude that he would not claim the horse for

him. Each party testified in support of their position and called other witnesses. We shall relate the relevant facts in more detail below.

On the morning of Thursday, January 2, 2020, Mr. Braude, who has practiced law for over 50 years, was reviewing the advanced race sheet for the Laurel Park Racetrack at his office when he became interested in Hydra, a one-year-old horse racing in the 8th race two days from then for the claiming price of $25,000. A "claiming race" is one in which all the horses racing are for sale at the same price, and one cannot physically examine the horse prior to the race. A horse is "claimed" by dropping a claim slip with the name of the horse, claimant, and trainer, and the signature of the claimant (or his authorized agent) into a lock box located in the Racing Office at least ten minutes before the post time for the race. The trainer's name is required on the claim slip so that the trainer of the successful claim can pick up the horse after the race. Many claims are made in the minutes prior to the race when the horse is brought into the paddock area where a person can visually observe the condition of the horse. Over the years, Mr. Robb had claimed at least 25 horses on behalf of Mr. Braude. Mr. Braude was interested in this horse because she had been sold a year earlier for $130,000.

Mr. Braude called Mr. Robb and asked him to submit a claim slip for Hydra before the 8th race. Mr. Braude testified that it was understood that Mr. Robb would be Hydra's trainer should the claim be successful. Ms. Dodd, Mr. Braude's legal secretary, testified that she overheard their conversation and understood that Mr. Robb would claim for Mr. Braude a horse named Hydra over the weekend. Mr. Braude asked Ms. Dodd to follow up with Mr. Robb to make the formal arrangements to claim the horse for him, as it was a new

2

year. Following the conversation, Mr. Robb texted Ms. Dodd that Mr. Braude needed to fill out a 2020 "Authorized Agent" form for him to claim the horse.

Around 10:30 a.m., the following day, Friday, January 3, Ms. Dodd, who had obtained the form, texted Mr. Robb for his address, date of birth, and social security number as required on the form, which Mr. Robb provided. During their text exchange, Ms. Dodd asked if he knew "the wire info to send the money to [the] track" because the Racetrack Bookkeeper's number was busy. Mr. Robb advised her that he did not have the information but to keep trying to reach the bookkeeper. At 1:35 p.m., Ms. Dodd had $25,000 wired from Mr. Braude's personal bank account into his racing account at Laurel Racetrack.

Around 11:00 a.m. on Saturday, January 4, Mr. Braude filed the "Authorized Agent" form at the racetrack's Racing Office. The form provides: "I have this day appointed John J. Robb . . . as an agent to act for me for the year 2020 in all matters pertaining to the racing of horses . . . under the Rules of Racing adopted by the Maryland Racing Commission." It further provided that Mr. Robb was authorized "to collect all purses and other money due from the associations racing under the jurisdiction of the Maryland Racing Commission for the year 2020 with authority to endorse checks of such association." The form was signed by Mr. Braude and notarized. A half an hour later, Mr. Braude went to the Bookkeeper's Office located in the Racing Office and asked if everything was in order for him to claim Hydra. He was informed he had $25,000 in his racing account but needed to deposit an additional $1,500 to cover Maryland's sales taxes in the event his claim was successful. Mr. Robb had not told Mr. Braude about this. Mr. Braude immediately deposited the tax amount into his account, which occurred before noon.

3

At around 12:30 p.m., Mr. Braude met Mr. Robb in the paddock area before the first race of the day to watch "Big Boots," a horse owned by Mr. Braude and trained by Mr. Robb. Mr. Braude told Mr. Robb that he had $26,500 in his racing account to claim Hydra, even though Mr. Robb had not told him or Ms. Dodd about the $1,500 required for taxes. Mr. Robb made no response. Mr. Braude told Mr. Robb to meet him about 15 minutes before Hydra's race so that they could jointly look at Hydra as she was coming into the paddock area to be saddled. Mr. Braude asked Mr. Robb if he had dropped a claim slip for Hydra yet. Mr. Robb said he had not, but he would.

Mr. Braude introduced into evidence video of the paddock area and the Racing Office about 30 feet away around 3:30 p.m. The video does not include any audio. According to the video and the accompanying testimony of Mr. Braude, Mr. Robb can be seen talking to a man, later identified as Eugene Gould, Jr., in an area near the paddock when Mr. Braude approaches the paddock. Mr. Robb then walks toward Mr. Braude as Hydra enters the paddock area. Mr. Braude testified that he asked Mr. Robb if he had dropped the claim slip on his behalf for Hydra and Mr. Robb replied, "[N]o. Did you get my text message?" Mr. Braude said he did not, that he had left his cell phone in his car. When he asked what was in the message, Mr. Robb responded that he was told that Hydra was "gimpy" and might have some physical issues. The two then walked closer to the paddock area so they could observe Hydra as she walked by them. Mr. Braude told Mr. Robb that Hydra looked "great" and again told him to drop a claim slip on his behalf for the horse. Mr. Robb agreed and then walked toward the Racing Office where the claim box

4

is located. The video shows Mr. Robb a short time later returning to the paddock area but quickly walking away when he sees Mr. Braude still in the paddock area.

Hydra came in second place in the 8th race, after which Mr. Braude walked to his car where he retrieved his cell phone. When Mr. Braude called Mr. Robb to see if their claim had been successful, Mr. Robb replied, "we got out shook," meaning there was more than one claimant for Hydra and the winner, which is determined through a public drawing, was someone else. Mr. Braude joked that Mr. Robb was unlucky for him as the same thing had happened a week earlier. Sometime later and while dealing with a flat tire on his car, Mr. Braude looked at the official Equibase Report which listed Hydra's new owner as Mr. Gould and the new trainer as Mr. Robb. Livid, he immediately called Ms. Dodd and told her that Mr. Robb had lied to him about being "out shook" and dropping a claim slip on his behalf as promised. Ms. Dodd testified that Mr. Braude was furious when he called her. Mr. Braude then called Mr. Robb and fired him.

The following morning, Sunday, January 5, Mr. Braude withdrew Mr. Robb as his authorized agent, and he called a steward at the Racetrack.[1] He explained what had

---

[1] The Maryland State Racing Commission (the "Commission"), which was created by the Maryland General Assembly as part of the Department of Licensing and Regulation, has "jurisdiction, supervision, powers, and duties . . . [over] each person who holds racing for a purse, reward, or stake." *See* Md. Code Ann., Business Regulation ("Bus. Reg."), §§11-201, 11-209(b)(1). *See also Mules v. Maryland Racing Comm'n*, 30 Md. App. 533, 535 (1976) (citation omitted). The Commission shall "adopt regulations and conditions to govern racing and betting on racing in the State" of Maryland. Bus. Reg. §11-210(a)(1). *See* COMAR Maryland Agency Rules, .09 (Department of Labor) and .10 (Maryland Racing Commission). Through COMAR 09.10.01.45(J.), the Commission grants stewards the power and duty "to regulate and govern the conduct of all racing officials and of all owners, trainers, jockeys, grooms, and other persons attendant on horses during, before,

(continued)

5

happened, stating that because of Mr. Robb's deceit and misrepresentation he was prevented from claiming Hydra. The stewards held a hearing in late January and ruled that because Mr. Gould had signed the claim slip, which Mr. Robb had dropped in the claim box, Mr. Gould's claim for Hydra was valid. After the stewards hearing, Mr. Braude brought a protest claim to the Maryland State Racing Commission. Notably, Mr. Braude filed the present action with the Circuit Court of Montgomery County prior to the resolution of his protest claim with the Commission.[2]

Mr. Braude called an expert in appraising horses who testified that Hydra's value as a brood mare was $75,000. After Mr. Gould purchased Hydra, he raced her over the next six months in seven claiming races. The first two claiming races were $40,000, but the

---

and after races[.]" *See also* COMAR 09.10.01.35 (concerning the process of raising objections to the stewards).

[2] The Commission did not hold a hearing until January 20, 2022, because of the ensuing COVID-19 pandemic. On February 3, 2022, the Commission filed a ruling and findings of fact, concluding that Mr. Robb had prevented Mr. Braude from filing a claim for Hydra by failing to advise him that he would not file a claim on his behalf. On February 4, 2022, Mr. Braude filed a request to supplement the appellate record to include the decision of the Commission. However, because the Commission's decision was not before the circuit court when ruling on Appellant's case, we decline to consider the Commission's decision on review.

We also note that, despite the unusual posture, this case is properly before us because there is no administrative/legal remedy scheme authorized by statute. *See Green Healthcare Solutions, LLC v. Natalie M. LaPrade Maryland Medical Cannabis Commission*, -- Md. App. -- No. 766 (September Term, 2021) (filed 4.28.22) ("Because there was no administrative review remedy authorized by statute or an administrative scheme providing for such relief, there was no exhaustion requirement[.]"). Here, although the relevant statute provides for an appeal to the circuit court from a Commission's ruling, there is no statutory requirement that one must first complain to the Commission before filing a complaint in the circuit court. *See* Bus. Reg. §§ 11-309 – 11.

6

remaining races were for $25,000. Mr. Braude testified that he did not claim Hydra after she was purchased by Mr. Gould because he was pursuing redress to overturn the claim through the State Racing Commission. He further explained that he had concerns about claiming her in the subsequent races because Hydra did not race for three-and-a half months after Mr. Gould bought her. The horse expert testified that information that the horse had not run for over three months might possibly alarm a potential claimer because it could indicate that the horse was injured. It was unclear whether Hydra did not race because the racetrack was closed at some point due to the COVID pandemic.

Mr. Robb testified in his defense. He testified that he claims horses for up to 10 different people at any given time, but he stated "[y]ou're only allowed to claim one horse" at a time. According to Mr. Robb, either on December 28 or January 2, he brought Hydra to Mr. Braude's attention and said he would claim the horse for Mr. Braude if Mr. Braude had the money. Mr. Braude told him that he didn't have $25,000, but "I can get it together." Because $25,000 was beyond Mr. Braude's usual claiming price, Mr. Robb advised Mr. Braude that he needed "to get back to me promptly if you want her. If you can get the money together, let me know. It's very important because I need time to get someone else if you don't."

At 1:00 p.m. the next day, he checked Mr. Braude's racing account and found there was no money in it, so he told Mr. Gould, his partner on a dozen or so other horses, about Hydra and offered to claim the horse for him. Mr. Gould confirmed that Mr. Robb told him that he wanted to claim Hydra the following day and he asked if Mr. Gould "want[ed] in." Mr. Gould testified that Mr. Robb said that he had planned to claim the horse for Mr.

7

Braude, but it did not work out. Mr. Gould testified that he knew nothing about Hydra but agreed, relying on Mr. Robb's experience.

According to Mr. Robb, the first time Mr. Braude told him that he had the money and wanted Hydra was when they were conversing about Big Boots before the first race on Saturday. When Mr. Braude told him that the money was in his account, Mr. Robb told him, "it's too late. . . . I've already mentioned this horse to another client." When Mr. Braude reiterated that he wanted Hydra, Mr. Robb then told him "it may be too late," explaining to him that the person to whom he had promised the horse was to come to the racetrack to sign the slip, and if he did, "[I would] honor my agreement with him because you failed on your agreement. You never notified me you wanted the horse. You never told me you had money in the account." Mr. Robb testified that during their later conversation while they watched Hydra come into the paddock area, he did not tell Mr. Braude that Hydra was gimpy but told him that he was not claiming the horse for him. Mr. Braude denied that Mr. Robb said that.

Mr. Robb admitted that when he left the paddock area, he told Mr. Braude that he was going to drop a claim slip, but he did not say for whom. He did not drop a claim slip for Mr. Braude but instead dropped a claim slip signed by Mr. Gould.[3] Mr. Robb testified that he had Mr. Gould's signed claim slip in his pocket when he was talking to Mr. Braude in the paddock area before Hydra's race.

---

[3] Mr. Gould did not sign an authorized agent form for Mr. Robb until a week later.

Mr. Robb testified that he had no contract with Mr. Braude to claim Hydra, arguing that Mr. Braude never told him he had the money or wanted the horse, which Mr. Robb had made clear to Mr. Braude he needed to do. Mr. Robb elicited from Ms. Dodd on cross-examination that he had complained to her on occasion that Mr. Braude often wanted to claim horses but did not have the money in his account, after which Mr. Robb would have to come up with the money and seek reimbursement from Mr. Braude the Monday following a claiming race. Mr. Robb explained that when Mr. Braude called after the race and asked, "did we get the horse?", he was walking back to the claiming office and said, "there's probably going to be a shake." He explained that he said this because a "very active claimer" had been present when he had dropped the claim slip for Mr. Gould in the drop box. Mr. Robb also testified that he does not charge a fee for claiming a horse but only charges a fee to care for the horse, after it is claimed.

Mr. Braude eventually filed a complaint in circuit court against Mr. Robb, alleging breach of contract, breach of fiduciary duty, and fraud. Mr. Braude's complaint requested damages under each count "in the amount of at least $100,000.00, the exact amount to be determined at trial."[4] Following a bench trial, the court made an oral ruling from the bench. The court found that Appellant and Mr. Robb "did not have a contract" because there was no consideration. The court ruled that the $70 fee to claim the horse was not sufficient

---

[4] At trial, Mr. Braude sought damages in the amount of $265,645. An exhibit setting forth the damage totals was not admitted into evidence. According to the not-admitted exhibit, the damage totals were based on Hydra's net earning since the race on January 4, which amounted to $75,000 for her value as a brood mare; plus $100,000 for punitive damages.

9

consideration nor was the expectation that Mr. Robb would be Hydra's trainer in the event the claim was successful. The court ruled at best there was a "gratuitous willingness" by Mr. Robb "to drop a claim, [but] a gratuitous act is not enforceable as a contract."[5]

As to the fiduciary duty claim, the court denied this count. The court ruled that Mr. Robb was Mr. Braude's agent, but Mr. Robb "at no time was an exclusive agent limited to serving only the services of Mr. Braude." Rather, Mr. Robb had several clients. The court lastly focused on what it saw as Mr. Braude's failure to mitigate by not submitting his own claim slip when he learned that Mr. Robb had not yet done so and by not purchasing Hydra at the subsequent claiming races. As mentioned above, the court did not address Mr. Braude's fraud count.

Appellant has timely appealed the circuit court's ruling. We shall provide additional facts as necessary below.

## DISCUSSION

### Standard of Review

When reviewing a bench trial decision, we will not set aside a trial court's judgment on the evidence unless it is clearly erroneous, giving "due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). We view the evidence in the light most favorable to the party who prevailed at trial. *Brault Graham, LLC v. Law Offices of Peter G. Angelos, P.C.*, 211 Md. App. 638, 660 (2013) (citations

---

[5] Appellant also alleged a second breach of contract count, claiming that Mr. Robb had overcharged him for horse care and training. At trial, Mr. Robb testified that he had mistakenly overbilled Mr. Braude. The court awarded Appellant $910 on that count, and Appellant has not appealed that ruling.

omitted). If a trial court does not make findings of fact, no presumption as to them arises merely from the decision. *Burroughs Int'l Co. v. Datronics Eng'rs, Inc.*, 254 Md. 327, 338 (1969). In contrast to factual findings, we review a trial court's legal findings de novo. *MBC Realty, LLC v. Mayor & City Council of Baltimore*, 192 Md. App. 218, 233 (2010).

## I.

Mr. Braude argues that the trial court erred in ruling that there was not an enforceable contract between the parties because there was no or insufficient consideration. Mr. Braude argues that under the theory of promissory estoppel there was sufficient consideration. The trial court failed to consider whether detrimental reliance occurred.[6]

In general, "a contract is defined as a promise or set of promises for breach of which the law gives a remedy[.]" *Maslow v. Vanguri*, 168 Md. App. 298, 321 (quotation marks and citations omitted), *cert. denied*, 393 Md. 478 (2006). A contract may be oral or written, expressed or implied. A valid contract is formed by, among other elements, an offer and acceptance and consideration. To create consideration, "'a performance or a return promise must be bargained for.'" *Chernick v. Chernick*, 327 Md. 470, 479 (1992) (quoting Restatement (Second) of Contracts § 71 (Am. L. Inst. 1981)).

Maryland applies the principle of the objective interpretation of contracts. *Cochran v. Norkunas*, 398 Md. 1, 16 (2007) (citations and footnote omitted). "Under the objective theory of contracts, we look at what a reasonably prudent person in the same position would

---

[6] The terms promissory estoppel and detrimental reliance are often used interchangeably. We shall use the latter term, as preferred and explained by the Court of Appeals in *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 146 n.1 (1996).

11

have understood as to the meaning of the agreement." *Id.* at 17 (citation omitted). *Mathis v. Hargrove*, 166 Md. App. 286, 318 (2005) ("Simply put, a court is to determine from the language of the agreement, what a reasonable person in the position of the parties would have understood the contract to mean at the time the contract was entered into[.]") (citations omitted).

Detrimental reliance "is an alternative means of obtaining contractual relief." *Md. Transp. Auth. Police Lodge #34 of the Fraternal Order of Police, Inc. v. Md. Transp. Auth.*, 195 Md. App. 124, 215 (2010), *rev'd on other grounds*, 420 Md. 141 (2011). *See also Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 169 (1996) ("[T]here are different ways to prove that a contractual relationship exists. . . . Traditional bilateral contract theory is one. Detrimental reliance can be another."). In *Pavel*, the Court of Appeals adopted the four-part test of the *Restatement (Second) of Contracts* § 90(1) (1979) to establish a claim for detrimental reliance:

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel*, 342 Md. at 166. Thus, where a contract lacks formal consideration, an enforceable contract may nevertheless exist by virtue of the doctrine of detrimental reliance.

12

The trial court here found no enforceable contract because there was a lack of consideration. The court ruled that the exchange between the parties was a "gratuitous willingness" by Mr. Robb "to drop a claim, but a gratuitous act is not enforceable as a contract." According to the court, to the extent there was some suggestion that Mr. Robb would be the trainer, that was not sufficient consideration because it was "not articulated as part of the deal[.]" We disagree with the trial court's ruling.

The trial court failed to make any findings of fact as to which version of events it believed, Mr. Braude's or Mr. Robb's. According to Mr. Braude, he requested Mr. Robb to drop a claim slip for him on three occasions: (1) on the telephone Thursday; (2) at the racetrack Saturday morning while looking at his horse Big Boots; and (3) later that day while looking at Hydra as she came into the paddock area. According to Mr. Robb, he offered to claim Hydra for Mr. Braude during their telephone conversation on Thursday, but only if he let him know in a reasonable time that he had the money. According to Mr. Robb, he did not hear from Mr. Braude until just prior to Big Boots' race. At that time, he said he might drop a claim slip for Mr. Braude if another person he had promised to drop a claim slip for did not show up. Later, while looking at Hydra, he alternatively told Mr. Braude he would not drop a claim slip for him, and he would drop a claim slip but he did not say for whom.

If Mr. Braude's version of events were found credible and if the court found that he had relied to his detriment on Mr. Robb's promise to drop a claim for him, Mr. Braude might recover under his claim for detrimental reliance. Because the trial court failed to make a credibility determination, we must remand for a new trial.

13

We note that although the trial court focused on the alleged lack of consideration, the trial court found other problems with the parties' alleged contract. The court stated that "material terms of the contract [were] . . . not laid out" and then suggested that too much time had elapsed between the offer and acceptance. Specifically, the court stated that "it was not reasonable to expect that Mr. Robb would just wait and wait and wait to have Mr. Braude come forth with what he needed, come forth with his end to get Hydra." Additionally, the court ruled that Mr. Braude failed to mitigate his injury because he did "not [] put down his own claim." Specifically, the court stated, "[I]f this is so important to you, then go into the office and make sure [Mr. Robb] doesn't get way late [sic]on the way or stops and chats with somebody and gets tied up and passed the deadline." The court also found that Mr. Braude failed to mitigate his injury when Mr. Braude chose not to claim Hydra in her next six claim races. We do not believe these are failures to contract in the context presented.

Acceptance is demonstrated by "an actual meeting of the minds regarding contract formation." *Cochran*, 398 Md. at 23. "Acceptance may be manifested by acts as well as by words." *Id.* Mutual assent, which is an integral component of every contract, includes two issues: "(1) intent to be bound, and (2) definiteness of terms." *Id.* at 14 (citation omitted). "Failure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking." *Id.* (citations omitted). "If the parties do not intend to be bound until a final agreement is executed, there is no contract." *Id.* (citations omitted). Courts and commentators have identified several factors that may

14

be helpful in determining whether the parties have manifested an intention to be bound, including:

> (1) the language of the preliminary agreement, (2) the existence of open terms, (3) whether partial performance has occurred, (4) the context of the negotiations, and (5) the custom of such transactions[.] . . . (1) whether the agreement has few or many details, (2) whether the amount involved is large or small, and (3) whether it is a common or unusual contract.

*Id*. at 15 (citations omitted). *See also Mogavero v. Silverstein*, 142 Md. App. 259, 272 (2002) (if an agreement omits an important term or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable). However, "when parties disagree as to the existence or terms of an oral agreement, their conduct and intentions may be employed to determine any ambiguous and unknown provisions of the contract." *Son v. Margolius, Mallios, Davis, Rider & Tomar,* 114 Md. App. 190, 213 (1997).

The court's rulings do not take into account the long-time partnership between the parties nor the context in which the oral contract took place, *i.e.*, because of the risk involved in a claiming race, waiting to drop a claim slip until after observing the horse is one way, and a very reasonable way, to minimize the risk. Moreover, even if Mr. Braude had unreasonably delayed in telling Mr. Robb that he had the money until the start of the races on Saturday, according to Mr. Braude's testimony, Mr. Robb still agreed to drop a claim slip for Hydra. Accordingly, if Mr. Braude's version of events were found credible, there was an offer and acceptance when the parties spoke before Big Boots' race. If the court finds that Mr. Braude reasonably relied on Mr. Robb to claim the horse for him under the theory of detrimental reliance, Mr. Braude was under no duty to claim the horse himself. We note that Mr. Braude repeatedly testified that he did not drop a claim slip because for

15

over 30 years he had relied on Mr. Robb to do so. We also note that to claim a horse, the horse must be retrieved from the grounds of the racetrack, and Mr. Braude is 80 years old and in poor health, he has lost his hearing and wears an eye patch. On retrial, the court should make findings of fact and a credibility assessment, and then conclusions based on the applicable law as to whether there was a breach of contract.

**II.**

Mr. Braude argues that the trial court erred in rejecting his breach of fiduciary duty count, finding that Mr. Robb did not owe him a fiduciary duty because Mr. Robb was not Mr. Braude's exclusive agent for the purpose of claiming Hydra. We agree the trial court erred.

"Agency is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act." *Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 3773 (2001) (quotation marks and citations omitted). "The ultimate question is of intent." *Id.* (citations omitted).

In *Green v. H & R Block, Inc.*, 355 Md. 488 (1999) the Court of Appeals set out the well-established duties an agent generally owes to its principal:

> An agent has "a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." RESTATEMENT (SECOND) OF AGENCY § 387 (1958). We have recognized the "universal principle in the law of agency, that the powers of the agent are to be exercised for the benefit of the principal *only, and not of the agent or of third parties.*"

*Green*, 355 Md. at 517 (some quotation marks and citations omitted). "Moreover, an agent is under a strict duty to avoid any conflict between his or her self-interest and that of the

16

principal[.]" *Miller*, 362 Md. at 380. *See also C–E–I–R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 366 (1962) ("It is an elementary principle that fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest.") (quotation marks and citation omitted). An agent is "not to place himself or voluntarily permit himself to be placed in a position where his own interests or those of any other person whom he has undertaken to represent may conflict with the interests of his principal." *Green*, 355 Md. at 518 (quotation marks and citation omitted). The Court of Appeals in *Green* stated:

> One of the primary obligations of an agent to his or her principal is to disclose any information the principal may reasonably want to know. *See Impala Platinum v. Impala Sales*, 283 Md. 296, 324 (1978) (quoting *Herring v. Offutt*, 266 Md. 593, 597 (1972)) (recognizing duty of fiduciary "to make full disclosure of all known information that is significant and material to the affairs" of the fiduciary relationship); *C–E–I–R, Inc.*, 229 Md. at 367 ("[T]he rule is well established that an agent is under a duty to disclose to his [principal] any information concerning the agency which the [principal] would be likely to want to know."). The obligation to disclose is strongest when a principal has a conflicting interest in a transaction connected with the agency. *See* RESTATEMENT (SECOND) OF AGENCY § 389 (1958) ("Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency *without the principal's knowledge.*") (emphasis added). An agent's failure to disclose information material to the agency thus constitutes a breach of the principal-agent relationship.
>
> Where an agent breaches a duty to the principal and profits from the breach, the principal may maintain an action to recover those profits for her or himself. *Nagel v. Todd*, 185 Md. 512, 517 (1946) (An agent "cannot make a secret profit out of any transaction with his principal."); RESTATEMENT (SECOND) OF AGENCY § 388 (1958) ("[A]n agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal.").

*Id*. at 518-19.

17

Here, the trial court denied the breach of fiduciary duty count, ruling that "[t]o the extent that Mr. Robb that day was made an agent, he at no time was an exclusive agent limited to serving only the services of Mr. Braude." While it is true that Mr. Robb could serve as a non-exclusive agent for other principals at the same time, he could not serve as an agent for more than one principal who was seeking to purchase the same horse. Mr. Robb specifically testified that he could only claim one horse at a time. When the agent form was signed and notarized, Mr. Robb was Mr. Braude's agent and owed him a fiduciary duty. Mr. Gould did not sign an agent form with Mr. Robb until a week after the Hydra race.

As we discussed above, however, there was conflicting testimony about whether Mr. Robb told Mr. Braude that he would or would not claim Hydra for him. According to Mr. Braude, he was unaware that Mr. Robb did not plan to drop a claim slip for him. Mr. Robb testified that he advised Mr. Braude that he would not drop a claim slip for him. If Mr. Braude is credible, Mr. Robb breached his fiduciary duty of care to Mr. Braude by placing himself in a position where his interests conflicted with those of Mr. Braude. On remand, the court should make findings of fact and a credibility assessment, and then conclusions based on the applicable law as to whether there was a breach of fiduciary duty.

**III.**

Lastly, Mr. Braude argues that the trial court erred when it failed to address his fraud count. We do not agree with Mr. Braude that the court erred in failing to address the fraud count. However, before we address what error if any was made by the court, we hold that the court addressed all of the claims presented to it by the Appellant including the fraud

18

claim. Mr. Braude presented several legal theories to support his claim: breach of contract, breach of fiduciary duty, and fraud. The court disposed of the claim even though it did not address each legal theory. *Medical Mut. Liab. Ins. Soc'y v. B. Dixon Evander & Assocs.,* 331 Md. 301, 310 (1993) ("[w]hen two counts are based upon the same facts, and merely represent different legal theories upon which the plaintiff can recover the same damages, the counts constitute a single claim".) *See also* Judge Kevin Arthur, *Finality of Judgments and Other Appellate Trigger Issues* 3.38 (2d ed. 2018).

In *Swinson v. Lords Landing Vill. Condo.*, 360 Md. 462, 476 (2000), the Court of Appeals set out the elements of fraud:

> To recover in a tort action for fraudulent misrepresentation, a plaintiff must prove that a false representation was made, that its falsity was either known to the maker or that the representation was made with such reckless indifference to the truth as to be equivalent to actual knowledge of falsity, that the representation was made for the purpose of defrauding the plaintiff, that the plaintiff not only relied on the representation but had a right to rely on it and would not have done the thing from which the injury arose had the misrepresentation not been made, and that the plaintiff actually suffered damage directly resulting from the misrepresentation.

(citations omitted). "As a general rule, when the failure to exercise due care creates a risk of economic loss only, and not the risk of personal injury, we have required an 'intimate nexus' between the parties as a condition to the imposition of tort liability." *Id.* at 477 (citations omitted). "That 'intimate nexus' may be satisfied by contractual privity . . . 'or its equivalent.'" *Id.* (quoting *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 534-35 (1986)). In *Goldstein v. Miles*, 159 Md. App. 403 (2004), *cert. denied*, 384 Md. 581 (2005), the Court of Special Appeals stated:

19

A statement that is "vague and indefinite in its nature and terms, or is merely a loose conjectural or exaggerated statement, is not sufficient to support" either a fraud or negligent misrepresentation action, because "such indefinite representations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain."

*Id*. at 436 (quotation marks and citation omitted). *See also Fowler v. Benton*, 229 Md. 571, 579 (1962) ("Ordinarily . . . the representation must be definite, and mere vague, general, or indefinite statements are insufficient, because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements."). "Furthermore, in determining whether the reliance was reasonable, the background and experience of the party that relied upon the representation is relevant." *Miles*, 159 Md. App. at 437 (citing *Parker v. Columbia Bank*, 91 Md. App. 346, 362 (1992)). The court incorrectly concluded that there was no factual basis or law that required it to address this legal theory.

Accordingly, we shall remand for retrial on the issue of fraud.

**THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**